USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|1|16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                      :

*In re Whole Foods Market Group, Inc. Overcharging*
*Litigation*

------------------------------------------------------------------X

15 Civ. 5838 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This case involves claims by plaintiffs Sean John and Joseph Bassolino that Whole Foods stores in New York City overcharged for certain pre-packaged foods. The complaint arises out of, and is based on, a June 24, 2015 press release ("Press Release") issued by the New York City Department of Consumer Affairs ("DCA") following an investigation into alleged overcharging by defendant Whole Foods Market Group, Inc. ("Whole Foods"), which operates those stores.

      The Press Release announced that the DCA's investigation had uncovered "systemic overcharging" for pre-packaged foods at Whole Foods stores in New York City. Soon after, John and Bassolino filed separate lawsuits, each a putative class action, against Whole Foods. On October 21, 2015, the Court consolidated the lawsuits and directed plaintiffs to file a consolidated amended complaint ("CAC"). The CAC, echoing the Press Release, alleges that Whole Foods mislabeled pre-packaged foods sold at its New York stores so as to overstate their weights, and thereby overcharged customers for those products. Plaintiffs seek money damages under New York General Business Law ("GBL") § 349, which prohibits deceptive trade practices; § 350, which prohibits false advertising; and under the doctrine of unjust enrichment. Plaintiffs also seek injunctive relief under the GBL.

      Whole Foods now moves to dismiss the CAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). As to Rule 12(b)(1), Whole Foods argues that plaintiffs lack standing to bring any claims because they have not adequately pled that they themselves suffered an injury-

in-fact, or to pursue injunctive relief because they have not alleged irreparable harm. As to Rule 12(b)(6), Whole Foods argues that the CAC fails to state a claim.

For the reasons that follow, the Court grants the motion to dismiss for lack of standing, because plaintiffs have not adequately alleged an injury to themselves.

## I. Background

### A. Factual Background[1]

#### 1. Whole Foods

A Delaware corporation headquartered in Texas, Whole Foods currently operates 422 stores throughout the United States and the United Kingdom. CAC ¶ 8. Fifteen stores are located in New York. *Id.*

Whole Foods bills itself as "America's Healthiest Grocery Store," and as a leader in providing the "finest natural and organic goods available." *Id.* (quoting Whole Foods Market, http://www.wholefoodsmarket.com/mission-values/core-values/we-satisfy-delight-and-nourish-our-customers (last visited Nov. 3, 2015)). Among the goods sold at Whole Foods stores are various pre-packaged products, including meats, dairy products, nuts, berries, vegetables, and

---

[1] The facts related herein are drawn primarily from the CAC, Dkt. 26 ("CAC"). The Court also considers the documents attached to the affidavit of David E. Sellinger in support of Whole Foods' motion to dismiss, Dkt. 29 ("Sellinger Aff."), including the DCA Press Release, *Department of Consumer Affairs Investigation Uncovers Systemic Overcharging for Pre-packaged Foods at City's Whole Foods* (June 24, 2015), Sellinger Aff., Ex. 1 ("DCA Rpt."), and Justin Wm. Moyer, *Whole Foods Under Investigation for Overcharging in NYC*, Washington Post (July 24, 2015), Sellinger Aff., Ex. 2 ("WP Art."), because the CAC expressly incorporates these documents by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Finally, in considering Whole Foods' motion to dismiss for lack of standing, the Court references the documents attached to plaintiffs' opposition brief, Dkt. 35 ("Pl. Br."), including the affidavit of Jeffrey Moll, originally submitted by Whole Foods in opposition to Bassolino's earlier motion to remand, Pl. Br., Ex. 2 ("Moll Aff."), and the supplemental exhibit submitted by plaintiffs after argument, Dkt. 40, Ex. 1 ("Consent Order"). *See Makarova v. United States*, 201 F.3d, 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

seafood. *Id.* ¶ 13. These products vary by weight from package to package, and each package is purportedly labeled and priced based on its individual weight. *See* Moll Aff. ¶ 6; CAC ¶ 14.

### 2. The DCA's Investigation and Press Release

On June 24, 2015, the DCA issued a Press Release announcing its "ongoing investigation" into Whole Foods' "system[ic] overcharging for pre-packaged foods." CAC ¶ 19 (quoting DCA Rpt. at 1). The Press Release stated that in fall 2014, the DCA had "conducted in-depth inspections into how Whole Foods was weighing and labeling its pre-packaged foods and discovered troubling issues with their labeling of the weight of pre-packaged foods." DCA Rpt. at 2. In winter 2014–2015, the Press Release stated, the DCA "revisited several stores and found products continued to be mislabeled." *Id.*

The Press Release reported that:

> DCA tested packages of 80 different types of pre-packaged products and found all of the products had packages with mislabeled weights. Additionally, 89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight, which is set by the U.S. Department of Commerce. The overcharges ranged from $0.80 for a package of pecan panko to $14.84 for a package of coconut shrimp.

*Id.* at 1; *see also* CAC ¶ 20.

According to the Press Release, the overcharges were especially prevalent in packages of products "labeled with exactly the same weight when it would be practically impossible for all of the packages to weigh the same amount." DCA Rpt. at 1–2.[2]

---

[2] Although the Press Release highlights instances of mislabeling that resulted in *overcharges*, the Washington Post, in an article quoted in the CAC, later reported that Whole Foods' labeling inaccuracies sometimes produce undercharges (discounts). WP Art. at 3. The article based this finding on the work of a reporter, who discovered that at a Whole Foods store in Tribeca in June 2015, "[m]ini roast beef sandwiches were all priced at $3.49 for 3 ounces, despite their varying weights, from 4.5 to 5.1 ounces," and "breaded chicken breasts were all priced at $5.99 for 7 ounces, even though the actual weights ranged from 6 to 9.2 ounces." *Id.* (internal quotation marks omitted).

### 3.    Plaintiffs' Claims

Bassolino and John are New York citizens who claim to "regularly shop[] at Whole Foods locations in New York City." CAC ¶¶ 6–7. Shortly after the DCA's Press Release, each plaintiff filed suit against Whole Foods, based on the labeling and charging practices described therein.[3]

In the CAC, plaintiffs allege that, during the past few years, they each "regularly purchased" from New York City Whole Foods stores pre-packaged products of the types identified in the Press Release. *See id.* ¶¶ 22–24. Specifically, they allege that during 2014 and 2015, John purchased pre-packaged cheese and cupcakes approximately one or two times per month from stores including those at 250 7th Avenue and 95 East Houston Street, *id.* ¶¶ 17, 22,[4] and that beginning in 2010, Bassolino purchased pre-packaged chicken fingers several times per month from the store in Union Square, *id.* ¶ 23.

The CAC alleges that, when purchasing pre-packaged products at New York City stores, plaintiffs and other consumers rely on Whole Foods' representation "that it has accurately priced these items according to their respective actual weights." *Id.* ¶¶ 14–15. However, plaintiffs claim, citing the Press Release, Whole Foods "routinely overcharge[es]" customers by overstating the weight of such products and "calculating price based on the greater weight." *Id.* ¶ 16. Plaintiffs allege that overcharged customers "have no way of knowing that they [are] in fact being overcharged for the pre-packaged products." *Id.* ¶ 35. Accordingly, plaintiffs allege,

---

[3] Bassolino filed suit on June 25, 2015, the day after the Press Release was issued. *See* 15 Civ. 6046, Dkt. 1, at 1. John filed suit on July 24, 2015. 15 Civ. 5838, Dkt. 1. The two cases were later consolidated. *Id.*, Dkt. 20.

[4] Although the CAC does not specify the Whole Foods store at which John purchased cheese and cupcakes, it alleges more generally that he "has routinely shopped, and purchased pre-packaged Products, at . . . Whole Foods locations . . . at 250 7th Avenue . . . and 95 East Houston Street." *Id.* ¶ 17.

at the time they made their purchases, they "were deceived into believing that Whole Foods was charging them by the actual weight of a given Product." *Id.* ¶ 33. However, neither plaintiff identifies any particular transaction in which he was, allegedly, overcharged.

Plaintiffs bring this lawsuit as a putative class action on behalf of "[a]ll persons who purchased at least one of the [pre-packaged products identified by the Press Release] from a Whole Foods store located within the State of New York within the previous six years." *Id.* ¶ 38. The CAC claims violations of GBL § 349, which prohibits deceptive trade practices, and § 350, which prohibits false advertising, and unjust enrichment. Plaintiffs seek money damages under GBL §§ 349 and 350, and injunctive relief barring Whole Foods from continuing to deceptively mislabel pre-packaged goods.

### 4. The Settlement Agreement Between the DCA Whole Foods

On December 23, 2015, after the CAC was filed, Whole Foods and the DCA entered into a settlement agreement. It terminated the DCA's investigation against Whole Foods, in exchange for Whole Foods' (1) payment of $500,000, and (2) implementation of policies and procedures for pricing and labeling accuracy. *See* Consent Order, ¶¶ 12, 20–34.

The Consent Order represents that Whole Foods "denies all of the [DCA's] allegations," and that "its agreements and payments pursuant to [the Consent Order] do not constitute an admission or finding of wrongdoing." *Id.* ¶ 14. It further states that Whole Foods "asserts that any items that were mistakenly labeled were incidents of simple human error, and not as a result of intentional misconduct." *Id.* ¶ 15. Finally, it provides that Whole Foods and the DCA agree that: (1) the violations alleged by the DCA are limited to New York City; (2) the DCA did not make any findings as to fraud with respect to New York City stores; and (3) the DCA did not find any evidence of systematic or intentional misconduct by any individual across the Northeast region or the company. *Id.* ¶ 17.

### B.    Procedural History

As noted, shortly after the issuance of the Press Release, plaintiffs each filed a putative class action against Whole Foods.  *See* 15 Civ. 6046, Dkt. 1 (Bassolino); 15 Civ. 5838, Dkt. 1 (John).[5]

On July 31, 2015, Whole Foods removed Bassolino's action to federal court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").  15 Civ. 6046, Dkt. 1.  On August 21, 2015, Bassolino's case was reassigned to this Court as related to John's.  On August 28, 2015, Bassolino moved to remand his case to state court, on the ground that Whole Foods had not demonstrated an amount in controversy exceeding CAFA's $5 million jurisdictional minimum.  *Id.*, Dkt. 14.  On September 25, 2015, Whole Foods moved to dismiss both lawsuits.  *Id.*, Dkt. 24; 15 Civ. 5838, Dkt. 16.  On October 2, 2015, the Court stayed briefing on the motions to dismiss, pending the resolution of Bassolino's motion to remand.  15 Civ. 6046, Dkt. 33; 15 Civ. 5838, Dkt. 18.

On October 5, 2015, the Court issued an order, directing Whole Foods to explain more concretely its basis for asserting potential damages of $5 million.  15 Civ. 6046, Dkt. 36.  In response, Whole Foods prepared a list of products that it understood, based on the DCA's Press Release, to be covered by the DCA investigation, and thereby within the scope of Bassolino's claims.  Moll Aff. ¶ 3.[6]  The list included a variety of meats, dairy products, and baked goods,

---

[5] John's original complaint named Whole Foods Market, Inc. as defendant.  15 Civ. 5838, Dkt. 1. On September 18, 2015, John dismissed that complaint and filed an amended complaint against Whole Foods.  *Id.*, Dkts. 12–14.

[6] As to categories of products where the DCA Press Release had not identified the specific products that were allegedly inaccurately labeled, Whole Foods listed the broad category encompassing that product, *e.g.*, cheese.  *Id.* ¶ 4.  The Court refers to the products listed in the DCA Report and Moll Affidavit as the "identified products."

including cheese plates, ground beef, chicken legs, chicken thighs, split chicken breasts, chocolate, cupcakes, vegan cupcakes, vanilla cake, and wing buckets. *Id.*, Ex. A; CAC ¶ 21. Jeffrey Moll, a Whole Foods senior data mining analyst, calculated that at least 11,420,178 packages of these products had been sold at Whole Foods stores in New York[7] during the time period covered by Bassolino's action. Moll Aff. ¶ 9. In explaining why CAFA's jurisdictional requirement had been met, Whole Foods calculated that applying, to each of these transactions, the lowest overcharge per package alleged by Bassolino ($0.80)[8] would result in approximately $9 million in damages. *See* 15 Civ. 6046, Dkt. 37, at 2–3.

On October 20, 2015, the Court heard argument on Bassolino's motion to remand. *See id.*, Dkt. 20, at 1. On October 21, 2015, the Court denied that motion, finding that Whole Foods had demonstrated, with reasonable probability, that the damages Bassolino sought, on the theory he had pled, exceeded $5 million. *Id.*, Dkt. 46; 15 Civ. 5838, Dkt. 20.[9]

---

[7] Moll's calculation encompassed transactions at Whole Foods Stores in New York State, as opposed to New York City, because Bassolino's initial proposed class included consumers who made purchases at Whole Foods stores statewide. *See* 15 Civ. 6046, Dkt. 1. By contrast, John's initial complaint, like the CAC, was confined to New York City stores. *See* 15 Civ. 4838, Dkt. 1, ¶ 29; CAC ¶ 38.

[8] This figure is based on the Press Release's statement that overcharges ranged from $0.80 to $14.84 per package. *See* 15 Civ. 6046, Dkt. 37, at 2.

[9] The Court based its holding on the calculations in the Moll Affidavit. *Id.* at 2–3. The Court further noted that, to reach a $5 million damages figure, Bassolino would have to establish an average of only 10 overcharged transactions per day in each of Whole Foods' New York City stores—a threshold easily surpassed under Bassolino's theory of systematic overcharges. *Id.* at 2.

The same day, the Court consolidated the Bassolino and John actions under the name *In re Whole Foods Market Group, Inc. Overcharging Litigation*, docketed under 15 Civ. 5838.[10] Dkt. 20.  On November 3, 2015, plaintiffs filed the CAC.

On November 20, 2015, Whole Foods filed a motion to dismiss the CAC, Dkt. 28, as well as a memorandum of law, Dkt. 30 ("Def. Br."), and an affidavit by Whole Foods' counsel, Sellinger Aff., in support.  On December 15, 2015, plaintiffs filed a brief in opposition.  Pl. Br.  On December 22, 2015, Whole Foods replied.  Dkt. 36 ("Def. Reply Br.").  On December 28, 2015, plaintiffs filed a sur-reply brief.  Dkt. 37 ("Pl. Sur-reply Br.").  On December 30, 2015, Whole Foods opposed plaintiffs' sur-reply brief.  Dkt. 38.  On January 5, 2016, the Court heard argument.  *See* Dkt. 41 ("Tr.").  On January 6, 2016, plaintiffs' counsel submitted a supplemental exhibit.  Dkt. 40, Ex. 1.

## II.  Discussion

Whole Foods moves to dismiss for lack of standing, under Rule 12(b)(1), and for failure to state a claim, under Rule 12(b)(6).  The Court addresses these arguments in turn.

### A.  Article III Standing

The Court first addresses standing, because it is necessary for subject matter jurisdiction. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990); *Wong v. CKX, Inc*., 890 F. Supp. 2d 411, 414–15 (S.D.N.Y. 2012).

#### 1.  Applicable Legal Principles

Constitutional standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the

---

[10] Unless otherwise specified, references to the docket herein will refer to this case number.

evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (summary order) (citing *Makarova v. United States*, 201 F.3d 119, 113 (2d Cir. 2000); *Malik v. Meissner*, 83 F.3d 560, 562 (2d Cir. 1996)). A plaintiff must "demonstrate standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)). "If [a] plaintiff[] lack[s] Article III standing, [the Court] has no subject matter jurisdiction to hear [his] claim," and his case must be dismissed. *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)); *accord Cacchillo*, 638 F.3d at 404 ("Generally, '[s]tanding is a federal jurisdictional question determining the power of the court to entertain the suit.'" (quoting *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (internal quotation marks and citation omitted))).

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, in resolving a motion to dismiss for lack of standing, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006). However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *accord APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003). Although "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage, *Lujan*, 504 U.S. at 561, "a plaintiff cannot rely solely on

conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing," *Baur*, 352 F.3d at 637.

Article III standing consists of three "irreducible" elements: (1) injury-in-fact, which is an "actual or imminent," "concrete and particularized" harm to a "legally protected interest"; (2) causation in the form of a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief. *Lujan*, 504 U.S. at 560–61; *accord Cacchillo*, 638 F.3d at 404 (reciting the "three familiar elements of standing: injury in fact, causation, and redressability").

Important here, for a plaintiff's alleged harm to be "particularized," it "must affect [him] in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth*, 422 U.S. at 502) (emphasis added). Accordingly, while a plaintiff "has standing to seek redress for injuries done to him, [he] may not seek redress for injuries done to others." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972); *accord Laird v. Tatum*, 408 U.S. 1, 13 n.7 (1972).

The requirement that the alleged harm be "concrete" means that the Court "need not credit [a complaint's] conclusory statements without reference to its factual context." *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146 (2d Cir. 2011) (internal quotation marks and citation omitted). As the Second Circuit has emphasized, "a plaintiff cannot rely solely on

conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur*, 352 F.3d at 637.

Finally, the requirement of "actual or imminent" harm means that to establish standing, plaintiffs must allege an injury that is non-speculative—allegations of harm that are merely "conjectural or hypothetical" will not suffice. *Lujan*, 403 U.S. at 560 (internal quotation marks omitted); *see also United States v. Probber*, 170 F.3d 345, 349 (2d Cir. 1999) (plaintiff lacked subject matter jurisdiction where alleged "injuries [were] too speculative to satisfy the case-or-controversy requirement of Article III"); *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 152 (S.D.N.Y. 2000) (dismissing claim "based upon mere speculation" for lack of standing).

### 2.     Analysis

The standing issue here is whether the two plaintiffs have alleged a personal injury to themselves that is concrete, rather than conclusory or speculative. The issue arises because plaintiffs do not make a single allegation of inflated pricing specific to a particular purchase of theirs. Instead, each alleges only that, from time to time, he bought pre-packaged food at Whole Foods stores: John alleges he bought cheese and cupcakes one or two times per month during 2014 and 2015, and Bassolino alleges he bought chicken fingers several times per month from 2010 to the date of the CAC. CAC ¶¶ 22–23. But plaintiffs—while claiming generally that over-weighting, and hence inflated pricing, was common at Whole Foods stores in New York City, *see id.* ¶¶ 16, 19–21, 24–25, 27, 31—do not allege that any particular purchase they made was affected by this practice.[11] (Indeed, neither identifies any particular purchase he made.)

---

[11] Plaintiffs further acknowledge that whether any particular purchase was overweighted is, as a practical matter, today impossible to reconstruct. *See* Tr. 21. Plaintiffs do not claim ever to have weighed any item they purchased from Whole Foods. *Id.* And with the food plaintiffs purchased having been eaten or disposed of—and with months or years having passed since the date of

Rather, to support the claim that John and Bassolino were overcharged, the CAC sets out two categories of allegations.

First, it makes broad and conclusory generalizations about plaintiffs' having purchased overweighted foods at Whole Foods. *See, e.g.*, CAC ¶ 34 ("Plaintiffs' injuries arise from Whole Foods' . . . charging Plaintiffs based upon [an] incorrect weight."); *id.* ¶ 36 ("Whole Foods has caused Plaintiffs . . . to overpay for the various pre-packaged Products."). Such generalized claims, however, cannot confer standing. *See Treiber v. Aspen Dental Mgmt., Inc.*, No. 15 Civ. 1506, 2016 WL 66525, at *2 (2d Cir. Jan. 6, 2016) (summary order) ("While plaintiffs' assertion of price gouging might, properly pled, demonstrate injury, because the allegation is wholly conclusory and unsupported by any facts, it is insufficient to support standing." (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))); *Amidax*, 671 F.3d at 146.[12]

Plaintiffs otherwise rely exclusively—and they so acknowledge, Tr. 21—on the DCA's Press Release. They argue that the results of the DCA's "long and thorough investigation," documented in the Press Release, make their claims of overcharging as to the food they bought sufficiently concrete. *See* Pl Br. 9; Pl. Sur-reply Br. 1–4.

Had the CAC adequately alleged an "across-the-board uniform pattern" of overcharging of all pre-packaged products—or, pertinent to John and Bassolino, of all pre-packaged cheese, cupcakes, and chicken fingers—during the relevant time period, plaintiffs' claims that they purchased such products within that period would satisfactorily plead an injury-in-fact. *See* Tr. 8

---

purchase—it is lost to history what any pre-packaged food bought by plaintiffs weighed on the date it was sold. *See* Tr. 21, 26.

[12] Nor would such allegations suffice, under Rule 12(b)(6), to state a claim. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

(Whole Foods' counsel conceding this point). But, crucially, upon a fair review, it is apparent

that the DCA Press Release—and, therefore, the CAC that tracks it—made no such claim, or

even close. Indeed, the Press Release *nowhere* recited a finding that every pre-packaged food

product—or every package of some narrower subset of pre-packaged products—sold at every

New York City Whole Foods store was labeled with an overstated weight so as to produce an

overcharge.

To the contrary, the Press Release stated only that the DCA, on unspecified dates in 2014

and 2015, tested packages of 80 types of pre-packaged products at unspecified New York City

stores.[13] As to those products, the Press Release stated that: (1) one or more packages of each

had been found to have a mislabeled weight, and (2) 89% of packages tested did not meet the

---

[13] The Press Release does not identify all 80 of the types of products tested. Rather, it states
generally that the DCA found that Whole Foods overstated the weights of products "including
meats, dairy and baked goods," and that "overcharges were especially prevalent in . . . [packages
of] nuts and other snack products (flavored almonds, pecan panko and corn nuts), berries,
vegetables, and seafood." DCA Rpt. at 1–2. It also states that the DCA inspected eight packages
of vegetable platters, eight packages of chicken tenders, and four packages of berries, and
indicates that, as to each of these products, at least one package was overpriced. *Id.* at 2.

The CAC puts an interpretive gloss on the Press Release by assuming that each of the
products in the meats/dairy/baked-goods categories that Whole Foods, in the course of opposing
Bassolino's motion to remand, attested to selling were ones as to which the DCA found an
overweighted package. On this basis, the CAC alleges overcharges not only as to the items
specified in the Press Release, but also on all pre-packaged products that Whole Foods, in
arguing that potential damages exceeded the $5 million CAFA threshold, identified as potentially
having been within the scope of the DCA's investigation. *See* Moll Aff. ¶¶ 3–5; *id.*, Ex A.
These products included: apple raisin strudel, cheese, cheese plates, chicken legs, chicken thighs,
chocolate cupcakes, ground beef, pumpkin pie, red leicester, rotisserie chicken halves, split
chicken breasts, value vanilla cake 9", vegan cupcakes, and wing buckets. *Id.*, Ex. A. In
submitting this list, however, Whole Foods did not represent that it was aware of the precise
products—apart from those specified in the Press Release—on which the DCA had found
overweighting. Indeed, it acknowledged that the list of products it set out might be over- or
under-inclusive relative to those inspected by the DCA. *See id.* ¶ 4 ("Where the DCA
information as to the packages inspected did not indicate a particular product with sufficient
specificity, [Whole Foods] included the category of that product (e.g., cheese).").

federal standard for the maximum amount that an individual package can deviate from the actual weight. DCA Rpt. at 1.

These statements fall very far short of reporting an investigative finding of ubiquitous, systematic over-weighting at Whole Foods' New York City stores. Rather, the Press Release's self-described "snapshot," *id.*, fairly read, reports multiple but not invariable incidents of this deceptive labeling practice. It does not provide any basis on which to infer across-the-board overcharging so as to embrace, other than by conjecture, the cheese and cupcakes, or the chicken fingers, that John and Bassolino, respectively, occasionally bought in 2014 and 2015.

More concretely, the Press Release fails, for two reasons, to make the factual allegations necessary to enable the CAC to state a claim. First, it leaves unresolved a number of important methodological questions about DCA's sampling that would be necessary to answer before a fair inference of systematic overcharging, extending to John's and Bassolino's respective purchases, could arise. For example: How many total packages of each identified product did the DCA test, and was that number statistically significant so as to support an inference that the weighting practices found by DCA applied to other packages of the same product sold by Whole Foods?[14] From how many stores did the DCA purchase each of the identified products, and were its findings as to the incidence of over-weighting consistent across these stores? Did the DCA purchase the specific types of products allegedly bought by John and Bassolino from the stores

_____

[14] The Press Release's statements that the DCA inspected only eight packages of vegetable platters, eight packages of chicken tenders, and four packages of berries, DCA Rpt. at 2, strongly suggest only *de minimis* sampling, yielding investigative results with no claim to statistical significance. These numbers of packages assuredly represent only a tiny fraction of the total number of packages of these products sold across Whole Foods' New York City stores on a given day. For context, Whole Foods estimated, in its affidavit opposing remand, that there were, at a bare minimum, 11,420,178 transactions "in which a package of at least one of the [identified products] was sold" during the relevant time period. Moll Aff., Ex. A.

in which they shopped, and did the products bought from those stores bear inflated weights?[15]  If so, how did the timing of the DCA's purchases in those stores compare to the timing of John's and Bassolino's purchases?  And to what extent did the DCA find that over-weighting as to particular products and stores was consistent, and persisted, over time?[16]

Second, and even more significant, the Press Release does not report, even within the limited parameters of the DCA's investigation, a finding of across-the-board overweighting.  To the contrary, the implication of the 89% statistic it recites is that the remaining 11% of tested packages did *not* violate the Department of Commerce's standard for the maximum amount that an individual package can deviate from the actual weight.  As the parties agreed at argument, based on the Press Release, it is not clear whether, or to what degree, the packages within this 11% subset were (1) accurately weighted, (2) underweighted, or (3) overweighted, but within the degree of variance permitted by the Department of Commerce.[17]  *See* Tr. 16–17 (defense counsel

---

[15] The Press Release states that the DCA investigation "focused on the eight stores that were open during the time of inspections," DCA Rpt. at 2, but it does not state which products it purchased at which stores.

[16] The Press Release states only that the initial investigation was conducted in 2014 and that in the winter of 2014–2015, DCA revisited "several stores and found products continued to be mislabeled."  DCA Rpt. at 2.

[17] The Press Release indicates that the practice of "mass-labeling"—*i.e.*, labeling multiple packages of a particular product with the same weight even where it would be practically impossible for all of the packages to weigh the same amount—appears to have contributed to many of the reported overcharges.  *See* DCA Rpt. at 1–2.  The Court notes that, absent intentional fraud, which plaintiffs do not allege and which the Consent Order indicates was not found by the DCA, *see* Consent Order ¶ 17, this practice could lend itself just as readily to producing *under*charges.  Indeed, the Washington Post article referenced in the CAC reports that a reporter "stumbled onto a discount" when investigating the labels of pre-packaged foods at Tribeca's Whole Foods store:  "Mini roast beef sandwiches were all priced at $3.49 for 3 ounces, despite their varying weights, from 4.5 ounces to 5.1 ounces[.] . . .  Similarly, breaded chicken breasts were all priced at $5.99 for 7 ounces, even though the actual weights ranged from 6 to 9.2 ounces."  WP Art. at 3 (internal quotation marks omitted).

outlining these three possibilities); Tr. 23 (plaintiffs' counsel conceding that "[i]t's within the realm of possibility that some of the packages were not overweight"). Therefore, even if one assumes *arguendo* that the DCA's testing methodology was sturdy enough to give rise to statistically significant conclusions as to the subset of products bought by John and Bassolino at the stores and during the time periods in which they bought them, there is no non-speculative basis on which to conclude that the *particular packages* of Whole Food products John and Bassolino bought were overweighted.

Rather, at most, plaintiffs can allege that *if* their purchases were of a product and at a store and during a time period covered by the DCA investigation, and if the results of that investigation were statistically significant as to such purchases, there is an 89% chance that each package they bought was overweighted.[18] But a claim based only on probabilistic evidence of injury, devoid of any factual allegations particular to the plaintiff and without a basis to plausibly infer that all covered products were implicated, does not adequately plead injury-in-fact. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (purpose of "actual or imminent" requirement for injury-in-fact is to "ensure that the alleged injury is not too speculative for Article III purposes").

---

[18] Bassolino faces an additional hurdle in reaching even this contingency, as he claims to have purchased a product—chicken fingers—that is identified in neither the Press Release (which refers only to chicken tenders), DCA Rpt. at 2, nor the Moll Affidavit (which refers to chicken legs, chicken thighs, rotisserie chicken halves, split chicken breasts, and wing buckets), Moll Aff., Ex. A, as a product tested by the DCA. Plaintiffs' counsel conceded at argument that chicken fingers and tenders are "different form[s] of product[s]" that are "marketed differently." Tr. 19–20; *cf. White City Shopping Ctr., LP v. PR Restaurants LLC*, 21 Mass. L. Rptr. 565 (Mass. Super. Ct. Oct. 31, 2006) (holding that tacos, burritos, and quesadillas are not "sandwiches"). Plaintiffs' argument that it can be inferred that because other chicken products were subject to overweighting, so too were chicken fingers, *see* Tr. 20, does not follow. To the contrary, it is undermined by the Washington Post article, quoted in the CAC, which reports that a reporter found that another pre-packaged chicken product—breaded chicken breasts—had been sold at a discount. WP Art. at 3.

The decisions by the Second Circuit in *Amidax*, *supra*, and the Eighth Circuit in *Wallace v. ConAgra, Inc.*, 747 F.3d 1025 (8th Cir. 2014), upholding—in very different contexts—the dismissal of claims for lack of standing, reinforce that injury-in-fact is not adequately pled by merely reciting a statistical or probabilistic likelihood of injury.

The plaintiff in *Amidax* was a company (Amidax) that used the Society for Worldwide Interbank Financial Telecommunication (SWIFT) network to complete international financial transactions. 671 F.3d at 143–44. It challenged administrative subpoenas that the federal government had issued to SWIFT in the wake of the September 11, 2001 attacks, on the ground that the subpoenas resulted in the government's unlawfully obtaining Amidax's financial information. *Id.* The Second Circuit upheld the dismissal of Amidax's suit for lack of standing for two reasons. First, there was no particularized showing that SWIFT had actually turned over Amidax's data to the government. *Id.* at 146. Therefore, the mere fact that Amidax stored information in the database was insufficient to support its claimed injury-in-fact. *Id.* Second, because the entire SWIFT database had not been turned over, "Amidax's allegations that *its* information was turned over by SWIFT . . . [was] speculative at best." *Id.* at 148 (emphasis added).

As the Second Circuit put the point: "Although it is *possible* that SWIFT . . . turned over Amidax's information to the government, for Amidax to have standing to sue, its alleged injury in fact must be plausible." *Id.* (emphasis added). And, the Circuit stated, "[g]iven the number of transactions routed over the SWIFT network on a daily basis [and] the unresolved ambiguity concerning the number of Amidax transactions in the SWIFT database, . . . Amidax's alleged injury is merely hypothetical and conjectural. It does not rise to the level of being plausible." *Id.*

*Wallace*, like this case, involved a consumer lawsuit. Plaintiffs alleged that they had purchased unspecified packages of Hebrew National beef products, some—but not all—of which had been misrepresented by ConAgra as being 100% kosher. 747 F.3d at 1027–28. Citing *Lujan*, the Eighth Circuit explained that in the context of a claim of a defective product, the requirement that the plaintiffs' injury-in-fact be "particularized" means that "it is not enough for . . . plaintiff[s] to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, [they] must allege that *their* product *actually exhibited* the alleged defect." *Id.* at 1030 (internal quotation marks and citations omitted) (emphasis in *Wallace*). The Circuit reasoned that, because the plaintiffs had not given it "any particularized reason to think [that their] own packages of Hebrew National beef actually exhibited the alleged non-kosher defect, . . . it remain[ed] entirely possible, maybe probable, that the packages of beef they personally purchased . . . [were] *exactly what was promised*." *Id.* at 1030–31 (emphasis in original). For this reason, the Circuit held, plaintiffs' claims of injury were based on "pure speculation," and were thus not cognizable under Article III. *Id.* at 1031 (citing *Clapper*, 133 S. Ct. at 1148).

*Amidax* and *Wallace* underscore the failure of the CAC to plead an injury-in-fact that is "actual" and "particularized" to plaintiffs. Simply put, John's and Bassolino's claims are based not on purchase-specific data, but instead on the assertion that, because most products that the DCA bought were overweighted, so, too, were theirs. But, critically, the CAC does not recite a factual basis on which to claim that all Whole Foods products—or even all packages of the types bought by John and Bassolino—were overweighted. Therefore, much as in *Amidax*, where less than the entire SWIFT database was turned over to the government, and in *Wallace*, where fewer than all beef products were tainted with non-kosher meat, plaintiffs' claims here that their

purchases (of cheese, cupcakes, and chicken fingers) were within the subset impacted by Whole Foods' unlawful conduct is impermissibly conjectural. Upholding the CAC on this theory would require the Court to "assum[e facts] for which there is no basis in the [CAC]." *Wallace*, 747 F.3d at 1031 n.2.

Plaintiffs seek to distinguish *Wallace* on the ground that the plaintiffs there did not plead facts establishing as high a probability of injury as plaintiffs claim here, or even facts "that allowed the court to infer how plausible it was that the products the plaintiffs purchased were tainted with non-Kosher meats." Pl. Br. 9; *see Wallace*, 747 F.3d at 1030 ("As we cannot discern from the complaint how many packages were tainted with non-kosher beef, it is unclear whether even a bare majority of Hebrew National packages were not kosher."). Similarly, they seek to distinguish *Amidax* on the ground that the Second Circuit "had no idea how many transactions were by the individual plaintiff[] . . . [or] what subset of the transactions were improperly handed to the government." Tr. 34.

However, for the reasons reviewed above, the DCA Press Release—the basis for John's and Bassolino's claims of injury—similarly does not permit an inference that it is more likely than not that the purchases these plaintiffs made were overweighted. Indeed, the data in the Press Release is too sparse and threadbare to permit any reliable estimate as to the statistical incidence of overweighting with respect to the cheese, cupcakes, and chicken fingers bought by John and Bassolino. Accordingly, as in *Amidax* and *Wallace*, any conclusion that these packages were, statistically, more likely than not overpriced would be based unacceptably on conjecture.

In sum, because the CAC does not plead "any particularized reason to think" that the packages they purchased were overpriced, "it remains entirely possible, maybe probable" that plaintiffs received "exactly what was promised." *Wallace*, 747 F.3d at 1030–31 (emphasis

omitted).  Under these circumstances, the personal harm that the CAC asserts is "hypothetical and conjectural.  It does not rise to the level of being plausible."  *Amidax*, 747 F.3d at 148.  The Court, therefore, holds that the CAC has not adequately pled an injury-in-fact, and that plaintiffs lack Article III standing to bring their claims.[19]  The Court thus dismisses the CAC, in its entirety, for want of subject matter jurisdiction.

### B.  Failure to State a Claim

#### 1.  Applicable Legal Principles

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)).  However, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

---

[19] This holding necessarily applies to plaintiffs' claims for injunctive relief, and thus obviates the need to address Whole Foods' narrower argument that plaintiffs lack standing to seek such relief because they have not pled "irreparable harm."  *See Schroedel v. N.Y. Univ. Med. Ctr.*, 885 F. Supp. 594, 598 (S.D.N.Y. 1995) (citing *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992)).

"[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

### 2. Analysis

The holding that plaintiffs lack standing to bring this suit makes it unnecessary to reach Whole Foods' alternative argument, under Rule 12(b)(6), that the CAC fails to state a claim. *See Rhulen Agency, Inc.*, 896 F.2d at 678. However, the Court notes that the basis for its standing holding necessitates the further holding that the CAC fails Rule 12(b)(6), too. That is because the CAC's failure to plead a non-speculative injury-in-fact necessarily means that it fails to plead an essential element of each of plaintiffs' claims: that they personally sustained an actual injury as a result of Whole Foods' allegedly deceptive practices.

As to plaintiffs' GBL claims, deceptive conduct is not actionable under GBL § 349 or § 350 unless it resulted in an injury to the plaintiff. *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ("To state a claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) *the plaintiff was injured as a result*.") (emphasis added); *Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 507 (S.D.N.Y. 2012) (claim for false advertising under § 350 requires showing, *inter alia*, "that the plaintiff was injured as a result of the deceptive practice, act or advertisement") (internal quotation marks omitted); *see also Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9, 12–17 (2002) (affirming dismissal of §§ 349 and 350 claims arising from risk of injury or death in rear-end collisions posed by alleged design defect in car backrests where plaintiffs' backrests

did not actually malfunction and thus did not harm plaintiffs or their passengers).  Similarly, to state a claim for unjust enrichment, the plaintiff must show that a benefit has been unfairly conferred on a defendant *to the detriment of the plaintiff*.  *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009) (claim for unjust enrichment under New York law requires showing, *inter alia*, that "(1) that the defendant benefitted; (2) *at the plaintiff's expense*") (internal quotation marks and citation omitted) (emphasis added); *Nordwind v. Rowland*, 584 F.3d 420, 435 (2d Cir. 2009) (claim for unjust enrichment cannot stand where plaintiff did not receive less than that to which he was entitled); *In re Canon Cameras*, 237 F.R.D. 357, 359–60 (S.D.N.Y. 2006) (plaintiff can bring claim for unjust enrichment only where he received "less than what he bargained for").

Accordingly, the CAC is defective on the alternative ground that it fails to state a claim.

## C.      Leave to Replead

"When a claim is dismissed because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend its complaint."  *ALB. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 254 (S.D.N.Y. 2004).  Federal Rule of Civil Procedure 15(a) instructs that courts "should freely give leave [to amend a complaint] when justice so requires."  However, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Amendment is futile if an amended complaint would fail to state a claim on which relief could be granted.  *See Troung v. Am. Bible Soc'y*, 171 F. App'x 898, 899 (2d Cir. 2006) (summary order); *see also Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.").

Here, John and Bassolino filed the CAC after Whole Foods moved to dismiss their separate complaints. Those motions were, in all material respects, substantively identical to the instant motion. Accordingly, plaintiffs have already had a fair opportunity to cure the pleading deficiency identified by Whole Foods and found here: the failure to allege with particularity facts that support a claim that they were personally overcharged.[20]

Even if this were not the case, amendment here would be futile. Plaintiffs have not pointed to any evidence outside the pleadings that would "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. On the contrary, plaintiffs concede that they did not weigh their pre-packaged food at the time of purchase, *see* Tr. 21, that—with the evidence having been eaten or otherwise disposed of, and with months or years having passed since the date of purchase—"the real weight of the perishables is [now] lost to history," Tr. 26, and that they possess no evidence with which to rehabilitate their claims as to the food they bought, Tr. 37. Therefore, "[t]he problem with [the CAC] is substantive," and "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Under these circumstances, any amendment would be futile. *Id.*; *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

The Court, therefore, dismisses the CAC with prejudice. *See Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 271 n.8 (S.D.N.Y. 2014) (denying leave to replead where plaintiffs

---

[20] When the Court consolidated the two actions, it notified plaintiffs that the CAC was their "opportunity to amend," and that they should not "expect that there will be an opportunity to yet re-amend if [Whole Foods'] motion to dismiss is granted or if . . . [they] realize there is something else [they] would have liked to have pled or corrected." Sellinger Aff., Ex. E (Transcript of Hearing, dated October 20, 2015, at 22).

already had an opportunity to amend their complaint to address deficiency); *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004) (same); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 549 (S.D.N.Y. 2015) (denying leave to replead where there was "no realistic prospect of rehabilitating plaintiffs' [ ] claims" and "plaintiffs ha[d] already availed themselves of one opportunity to amend their complaint").

## CONCLUSION

For the foregoing reasons, the Court dismisses the CAC in its entirety, with prejudice. The Clerk of Court is respectfully directed to terminate the motions pending at 15 Civ. 5838, Dkt. 28, and 15 Civ. 6046, Dkt. 24, and to close both cases.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 1, 2016
New York, New York