```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/17/19
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

WHOLE FOODS MARKET GROUP, INC.
OVERCHARGING LITIGATION

15 Civ. 5838 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

On June 24, 2015, the New York City Department of Consumer Affairs (the "DCA")

issued a press release stating that, based on its investigation, Whole Foods Market Group, Inc.

("Whole Foods"), by assigning exaggerated weights to pre-packaged foods priced by individual

weight, frequently overcharged consumers for these products. Soon after, plaintiff Sean John

("John"), a customer of certain Whole Foods stores in Manhattan, brought a putative class action

against Whole Foods based on his having purchased allegedly short-weighted pre-packaged

cupcakes and cheeses during 2014 and 2015. John did not claim ever to have weighed any

cupcake or cheese that he had bought, to have direct evidence of any kind that any product he

had bought had been short-weight, or even to have retained records of his purchases. His claim

to have been personally overcharged was instead based on extrapolating from the DCA

investigation.

Discovery, fact and expert, is now complete on John's individual claims. Whole Foods

seeks summary judgment on these claims. Whole Foods argues that the undisputed facts would

not permit a jury to find, other than by speculation, that John himself was ever overcharged by

Whole Foods for any pre-packaged food item. This failure, Whole Foods argues, entitles it now

to prevail, either on the merits or because the same facts demonstrate that John has failed to

1

establish an injury-in-fact, as necessary for Article III standing.  John counters that a jury could find injury to him by extrapolating from what he contends is proof of a uniform Whole Foods practice of falsely inflating the weights, and therefore the price, of its pre-packaged foods.  John argues that a jury could find that Whole Foods used "[u]niform, [s]ystematic [p]ractices" to prepare and price cupcakes and cheeses and, considering these unitary practices alongside the DCA's findings of short-weighted products, could infer that at least some items John bought in 2014 and 2015 must also have been short-weight.

For the following reasons, the Court finds that the evidence adduced could not support a verdict in John's favor.  Although John's testimony can establish that he purchased cupcakes and cheeses from two Whole Foods stores, there is no competent, non-speculative, evidence that any cupcake or cheese item John bought weighed less than the weight used to price it.  The DCA investigation, in the form of spot checks at certain stores, does not support the inference of systematic over-pricing.  And John in discovery did not adduce competent evidence of a uniform practice by Whole Foods of falsely inflating the weight of its pre-packaged goods in general, or of cupcakes and cheese in particular.

Although John's failure to prove his own injury would support either dismissal for lack of Article III standing or entry of summary judgment for Whole Foods on the merits of his claims, the Court dismisses this case for lack of standing because standing is jurisdictional.

## I.      Background[1]

### A.      The Parties

#### 1.      Whole Foods

A Delaware corporation headquartered in Texas, Whole Foods currently operates 21 stores in New York state, 12 of which are located in New York City.[2] JSF ¶¶ 1–2. Among the goods sold at Whole Foods are various pre-packaged products. These included baked goods, meats, dairy products, nuts, berries, vegetables, and seafood. *Id.* ¶ 3. Each package is labeled and priced based on weight, as such weight is determined by Whole Foods. *Id.* ¶ 4.

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions on the motion for summary judgment, including the Joint Statement of Undisputed Facts, Dkt. 86 ("JSF"), defendant's Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 90 ("Def. 56.1"), plaintiff's counter-statement and statement of additional disputed facts, *see* Dkt. 94 ("Pl. Counter 56.1"), and defendant's counter-statement to plaintiff's counter-statement, *see* Dkt. 97 ("Def. Counter 56.1"); the January 25, 2019 Declaration of David Sellinger in support of defendant's motion, Dkt. 89 ("Sellinger Decl."), and attached exhibits; the February 28, 2019 Declaration of D. Greg Blankinship in support of plaintiff's opposition, Dkt. 96 ("Blankinship Decl."), and attached exhibits; and the March 18, 2019 Declaration of David Sellinger in further support of defendant's motion, Dkt. 99 ("Sellinger Reply Decl."), and attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("[E]ach statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] The Court in this Opinion mentions eight stores by name:  270 Greenwich Street, New York, NY 10007 (the "Tribeca store"); 95 East Houston Street, New York, NY 10002 (the "Bowery store"); 4 Union Square South, New York, NY 10003 (the "Union Square store"); 250 7th Avenue, New York, NY 10001 (the "Chelsea store"); 226 East 57th Street, New York, NY 10022 (the "Midtown East store"); 10 Columbus Circle, New York, NY 10019 (the "Columbus Circle store"); 808 Columbus Avenue, New York, NY 10025 (the "Columbus Avenue store"); and 214 3rd Street, Brooklyn, New York 11215 (the "Brooklyn store").

### 2. Plaintiff Sean John

John is a resident of New York. He works as a caterer and private chef in New York City. *Id.* ¶ 5. John makes purchases from Whole Foods for both his catering work and for personal consumption. *Id.* ¶ 6.

### B. The Initial Complaint

On June 24, 2015, the DCA issued a press release announcing an "ongoing investigation" into Whole Foods and its finding that the company "routinely overstated the weights of its pre-packaged products." *See* JSF ¶ 20; Dkt. 35-1 ("Press Release") at 1. The Press Release stated that, in fall 2014, the DCA had "conducted in-depth inspections into how Whole Foods was weighing and labeling its pre-packaged foods." Press Release at 2. In winter 2014–2015, the Press Release stated, the DCA "revisited several stores and found [that] products continued to be mislabeled." *Id.*

The Press Release concluded that

DCA tested packages of 80 different types of pre-packaged products and found all of the products had packages with mislabeled weights. Additionally, 89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight, which is set by the U.S. Department of Commerce. The overcharges ranged from $0.80 for a package of pecan panko to $14.84 for a package of coconut shrimp.

*Id.* at 1.

A month later, on July 24, 2015, John filed a putative class action against Whole Foods Market, Inc., claiming violations of sections 349 and 350 of the New York General Business Law ("GBL"). Dkt. 1.[3] Federal jurisdiction was based on the Class Action Fairness Act, 28

---

[3] Unless otherwise specified, references to the docket herein will refer to 15 Civ. 5838.

U.S.C. § 1332(d) ("CAFA"). *Id.* John based his claim of systematic overcharges for pre-packages products on the DCA Press Release. *See id.*[4]

### C.   Initial Proceedings Before This Court

On July 31, 2015, Whole Foods removed to federal court, under CAFA, a class action filed against it by plaintiff Joseph Bassolino, who brought similar claims to John's but involving other products (e.g., chicken fingers). *See* 15 Civ. 6046, Dkt. 1. On August 21, 2015, Bassolino's case was reassigned to this Court as related to John's. 15 Civ. 6046, Dkt. 8.

On August 28, 2015, Bassolino filed a motion to remand on the grounds that Whole Foods had not demonstrated that the amount in controversy exceeded CAFA's $5 million jurisdictional minimum. 15 Civ. 6046, Dkt. 17. On September 25, 2015, while the remand motion was pending, Whole Foods moved to dismiss both John and Bassolino's lawsuits. Dkt. 16; 15 Civ. 6046, Dkt. 24. On October 2, 2015, the Court stayed briefing on the motions to dismiss pending the resolution of Bassolino's motion to remand. Dkt. 18. On October 21, 2015, after hearing argument, the Court denied Bassolino's motion to remand. 15 Civ. 6046, Dkt. 46. The Court consolidated the John and Bassolino actions under the caption *In re Whole Foods Market Group, Inc. Overcharging Litigation*, and docket number 15 Civ. 5838. On November 6, 2015, plaintiffs filed a Consolidated Amended Complaint, Dkt. 26 ("CAC"), bringing claims under GBL §§ 349 and 350, and under the doctrine of unjust enrichment.

On November 20, 2015, Whole Foods moved to dismiss the CAC for lack of standing, under Rule 12(b)(1), and for failure to state a claim, under Rule 12(b)(6). Dkt. 30. On March 1, 2016, the Court granted the motion to dismiss on both grounds. *See In re Whole Foods Mkt.*

---

[4] On September 18, 2015, John filed an amended complaint against Whole Foods Market Group, Inc., Dkt. 11, and dismissed his claims as against Whole Foods Market, Inc. Dkts. 13–14.

*Grp., Inc. Overcharging Litig.*, 167 F. Supp. 3d 524, 538 (S.D.N.Y 2016) ("*Whole Foods I*"), *rev'd*, 858 F.3d 732 (2d Cir. 2017).

The Court held, first, that the CAC did not adequately plead a particularized injury-in-fact. Although John and Bassolino had each alleged that he had bought certain categories of pre-packaged foods several times per month from various Whole Foods stores, neither alleged having ever weighed the foods they purchased, and neither alleged that "any particular purchase they made was affected" by short-weighting. *Id.* at 532. Plaintiffs' claim to have paid excessive prices for these foods based on allegedly excessive weights was thus unsubstantiated, generalized, and conclusory. *Id.*

And, the Court held, the DCA Press Release, the sole basis on which plaintiffs claimed that Whole Foods had sold them pre-packaged food bearing excessive weights, did not support this claim. *Id.* at 533–37. The Press Release, the Court noted, had not alleged an across-the-board uniform pattern of overcharging of all pre-packaged products—or, pertinent to John and Bassolino, of all pre-packaged cheese, cupcakes, and chicken fingers—during the relevant time period. *Id.* at 533–35. Had it done so, the Court held, plaintiffs' claims tracking the Press Release and alleging that they had purchased a product in these categories within the same time period would plead an injury-in-fact. *Id.* at 535–37. But, the Court noted, the DCA Press Release had done no more than state that: (1) one or more types of pre-packaged products in the categories plaintiffs had purchased (cheese and cupcakes for John; chicken fingers for Bassolino) had been found to have a mislabeled weight, and (2) 89% of all packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight. *Id.* at 433–37. Further, the Press Release did not identify the stores at which the pre-packaged products had been tested and did not allege that DCA inspectors had tested products

from the Whole Foods stores at which John and Bassolino shopped.  Instead, the Court noted, the Press Release described, by its terms, a "snapshot." *Id.* at 534.  The Press Release, the Court stated, "fall[s] very far short of reporting an investigative finding of ubiquitous, systematic over-weighting" and "does not provide any basis on which to infer across-the-board overcharging so as to embrace, other than by conjecture," the pre-packaged products purchased by the plaintiffs in 2014 and 2015.  *Id.*  The Court also noted methodological issues affecting the DCA's sampling practices.  *Id.* at 534–35.  Finally, the Court noted, the DCA's finding that the listed weight of the remaining 11% of tested packages did not deviate from their actual weight undercut plaintiffs' claim of ubiquitous, systematic, short-weighting.  *Id.*  Reviewing cases in which injury-in-fact had been held lacking, the Court held that the CAC—by not alleging that any specific package had been sold at an inflated price, by failing to allege across-the-board short-weighting, and by claiming a likelihood of injury based only on probabilistic evidence—had failed to adequately allege an injury-in-fact.  *Id.* at 535–37 (citing, *inter alia*, *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011); and *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014)).

This Court therefore granted the motion to dismiss for lack of Article III standing.  *Id.* at 537.  The Court further held that, while it was not necessary to reach Whole Foods' alternative argument under Rule 12(b)(6), in light of the CAC's failure to plead injury-in-fact, the CAC necessarily failed to state a GBL claim.  *See id.* at 538 ("[T]he CAC's failure to plead a non-speculative injury-in-fact necessarily means that it fails to plead an essential element of each of plaintiffs' claims: that they personally sustained an actual injury as a result of Whole Foods' allegedly deceptive practices.").

### D.     The Second Circuit's Decision

On March 30, 2016, John and Bassolino appealed.  Dkt. 46.  On April 26, 2016,

Bassolino dropped his appeal.  *See John v. Whole Foods Mkt. Grp., Inc.*, No. 16-986, Dkt. 41 (2d

Cir. Apr. 26, 2016).

On June 2, 2017, the Second Circuit reversed.  It held that John had plausibly alleged

injury-in-fact sufficient to confer Article III standing.  *See John v. Whole Foods Mkt. Grp., Inc.*,

858 F.3d 732, 738 (2d Cir. 2017) ("*Whole Foods II*").  The Circuit noted that, in the CAC, John

had alleged regularly purchasing pre-packaged cheese and cupcakes, and that the DCA

investigation had termed the short-weighting of such pre-packaged foods as "systematic" and

"routine."  *Id.* at 736.  And, the Circuit stated, "[a] facial attack on the pleadings is not the proper

stage to determine whether the DCA's sampling methods justified its declaration of widespread

overcharging."  *Id.* at 737.  Rather, "[a]t the pleading stage, John need not prove the accuracy of

the DCA's findings or the rigor of its methodology; he need only generally allege facts that,

accepted as true, make his alleged injury plausible."  *Id.* (citation omitted).  "Taking [the CAC's]

allegations as true and drawing all reasonable inferences in [John's] favor," the Circuit held, "it

is plausible that John overpaid for at least one product."  *Id.* at 737.  The CAC thus "satisfie[d]

the 'low threshold' required to plead injury in fact."  *Id.* at 738 (citing *WC Capital Mgmt., LLC v.*

*UBS Secs., LLC*, 711 F.3d 322, 329 (2d Cir. 2013)).

In remanding for further proceedings, the Circuit acknowledged that "John may

ultimately be unable to show he was injured under the more demanding standards applicable at

summary judgment . . . ."  *Id.* at 737.  And the Circuit acknowledged this Court's concern "that

John faces what may be significant evidentiary obstacles on the merits."  *Id.*  However, the

Circuit stated, "targeted discovery might show whether those obstacles can be surmounted."  *Id.*

### E.     The Post-Remand Discovery Schedule

On October 23, 2017, after soliciting the parties' views, the Court approved a new case

management plan, with discovery conducted in two phases.  The plan contemplated, first, full

discovery (fact and expert) on John's individual claims, followed by an anticipated motion by

Whole Foods for summary judgment.  The case management plan further contemplated, if John's

claims survived summary judgment, a second phase of discovery, in anticipation of a motion by

John for class certification.  Dkt. 56.

On November 11, 2017, the Court granted John leave to file a Second Amended

Complaint ("SAC") to excise Bassolino and allegations unique to his claims.  Dkt. 58.  On

November 22, 2017, John filed the SAC, the operative complaint today.  Dkt. 59.  On December

12, 2017, Whole Foods answered.  Dkt. 61.

On July 13, 2018, during discovery, the Court granted a joint motion to extend the

schedule for discovery of John's claims.  Dkt. 73.  On October 19, 2018, the Court again

extended the schedule for such discovery, this time to accommodate a mediation session, and

extended the schedule for briefing on the summary judgment motion.  Dkt. 79.  Discovery on

John's claims closed on December 14, 2018, with the completion of expert discovery.  *See id.*

### F.     Whole Foods' Summary Judgment Motion

On January 18, 2019, the parties filed a joint statement of undisputed facts in anticipation

of Whole Foods' summary judgment motion.  Dkt. 86.  On January 25, 2019, Whole Foods filed

a motion for summary judgment, Dkt. 87, an accompanying memorandum of law, Dkt. 88 ("Def.

Mem."), the Sellinger Declaration, Dkt. 89, and a Rule 56.1 statement, Dkt. 90.  On February 28,

2019, John filed a Rule 56.1 counter-statement with additional facts, Dkt. 94, a memorandum in

opposition, Dkt. 95 ("Pl. Mem."), and the Blankinship Declaration, Dkt. 96.  On March 18, 2019,

Whole Foods submitted an additional counter-statement responding to John's Rule 56.1 counter-

statement, Dkt. 97, a reply memorandum of law, Dkt. 98 ("Reply Mem."), and the Sellinger

Reply Declaration, Dkt. 99.

On March 27, 2019, John filed a letter motion seeking leave to file a sur-reply to respond

to the allegedly new facts contained in the declaration of Christy Taylor submitted in connection

with Whole Foods' reply brief. Dkt. 100. On April 1, 2019, Whole Foods opposed the motion

by letter. Dkt. 105. On April 23, 2019, the Court denied John's request, finding that Taylor's

reply declaration did not "raise new issues which are material to the disposition of the question

before the Court." Dkt. 107 (citation and quotation marks omitted). On May 6, 2019, John filed

a motion for reconsideration, Dkt. 109, an accompanying memorandum of law, Dkt. 110, and a

declaration from D. Greg Blankinship in support, Dkt. 111. On May 20, 2019, Whole Foods

filed an opposition to the motion for reconsideration, Dkt. 113, and a new declaration from

David Sellinger, Dkt. 114. On May 28, 2019, John filed a reply memorandum of law, Dkt. 115,

with an accompanying reply declaration from Blankinship, Dkt. 116. On May 30, 2019, the

Court denied John's motion for reconsideration. Dkt. 118.

On June 3, 2019, the Court heard argument on the summary judgment motion.

## II.     Facts Adduced in Discovery

A detailed understanding of the facts adduced in discovery is necessary to assess fairly

Whole Foods' summary judgment motion. These facts fall into three categories: facts relating to

John's purchases; facts relating to the DCA investigation of the weight of pre-packaged foods

sold by Whole Foods; and facts relating to Whole Foods' food production and packaging

practices.

### A.     John's Whole Foods Purchases

John shopped at Whole Foods during the period covered by the DCA investigation,

namely, January 1, 2014 through December 31, 2015. JSF ¶¶ 5, 12; Pl. Counter 56.1 ¶ 3. John

10

shopped at two Whole Foods stores: the Bowery store (located at 95 East Houston Street) and the Chelsea store (250 Seventh Avenue).  JSF ¶ 7.  Between December 2013 and October 2015, John made purchases from Whole Foods in cash and by debit card, but more often with cash.  *Id.* ¶ 11; Def. Counter 56.1 ¶ 97.  John's bank statements evidence 22 debit card purchases.  JSF ¶¶ 11– 12.  Those purchases range in expense from a minimum of $5.66 to a maximum of $117.42.[5]  *Id.* John's average purchase over these 22 occasions, with cash back removed, was $36.17.  *See id.* John does not possess any store-printed receipts for any of his purchases at Whole Foods during the relevant period.  *Id.* ¶ 13.

During this period, John states, he purchased pre-packaged cupcakes and pre-packaged cheeses from Whole Foods.  He purchased these products approximately one or two times per month.  Pl. Counter 56.1 ¶ 3.  John states that he purchased vegan and chocolate cupcakes.  JSF ¶ 10.  As to cheese, John states that he purchased cheddar, parmesan, goat, mozzarella, brie, blue, and truffled cheese.  Pl. Counter 56.1 ¶ 4.

John does not have labels from or photographic evidence of any cheese or cupcake product that he purchased during that period.  JSF ¶¶ 17–19.

John brought this lawsuit after he saw online "blurbs" about the DCA investigation.  Pl. Counter 56.1 ¶ 11.

### B.    The DCA Investigation

The DCA conducts inspections of grocery stores to identify violations of the New York State Agriculture and Market Law.  JSF ¶ 28.  Its work includes testing for overpricing of pre-packaged products.  *See id.* ¶ 29.

---

[5] In so tabulating, the Court has removed $20 in cash back from this purchase.  *See* JSF ¶ 12 n.2.

Between June 16, 2014 and February 20, 2015, the DCA inspected eight Whole Foods stores, making a combined 13 visits to these stores. *Id.* ¶ 21. These visits included the two stores at which John shopped: the Bowery store and the Chelsea store. *Id.* ¶ 7. The Chelsea store was one of five stores that the DCA inspected twice. *See id.* ¶ 21.

Twelve of the 13 store investigations were conducted by two-person DCA teams, led by either Inspector Erin Moriarty or Inspector Alex Gershkovich.[6] *Id.* ¶ 22. Moriarty led the inspection of all eight stores from October to December 2014. *See infra.* p. 15 n.7. Following Moriarty's investigations of the eight stores, the DCA created an internal report entitled "Whole Foods Market Group Inc. Package Control Initiative 2014." Sellinger Decl. Ex. 10 at 202–09 ("Whole Foods Report"). The report concluded that, based on the eight inspections conducted, there was "an 89.6% chance [a customer] would get a mislabeled package and be overcharged for that purchase." Whole Foods Report at 4.

In February 2015, Gershkovich reinspected four Whole Foods stores. *See* JSF ¶ 73. The DCA's Press Release publicizing the results of these inspections issued on June 24, 2015. *Id.* ¶ 20.

### 1.      Protocol of the DCA Investigation

The DCA conducts package inspections to test goods labeled by weight. Sellinger Decl. Ex. 9 (affidavit of James Hurst, the DCA's Director of Enforcement ("Hurst Aff.")) ¶ 3. To guide these inspections, it relies on an internal document, entitled "Comprehensive Supermarket Inspection Protocol." Sellinger Decl. Ex. 10 at 40–77. The DCA's protocol complies with the

---

[6] Inspectors Valentino and Savino appear to have conducted the first inspection of the Chelsea store on June 16, 2014. *See* Sellinger Decl. Ex. 15.A (June 16, 2014 Notice of Hearing) at 75. The only products they reported as below stated weights were "split chicken breasts," "ground beef," and "mixed berries platter." *Id.* at 70. These products are not at issue here as John does not claim to have purchased them.

United States Department of Commerce's National Institute of Standards and Technology ("NIST") Handbook 133: Checking the Net Contents of Packaged Goods.  JSF ¶ 4.

An inspection includes two separate phases: first, an audit test, and then a statistical analysis test.  *Id.* ¶¶ 32–33.  The Comprehensive Supermarket Inspection Protocol provides instructions for the audit test (also known as the "Package Audit Inspection Process") and the statistical analysis test (also known as the "Package Control Violation Process").  *Id.* ¶ 67.

During an inspection of a supermarket, pursuant to the protocol, inspectors choose products from four different departments: deli, produce, meat, and bakery.  *Id.* ¶ 81.  In the initial phase, the audit test, a DCA inspector selects particular products from a "lot," or a "collection of identically labeled (except for the quantity or identity in the case of random packages) packages available for inspection at one time" to test manually for weight violations.  *Id.* ¶ 35 (quoting Sellinger Decl. Ex. 10 at 78–137 (2014 NIST Handbook 133) at 2–3).  At least two packages from a selected lot are to be weighed.  Hurst Aff. ¶ 8.  If the initial audit finds a material discrepancy with respect to weight for those packages, the entire lot of packages available is removed from the display shelf and subjected to the second phase of the inspection, statistical analysis testing.  JSF ¶ 46.  In contrast, if the products tested in the audit phase are not found to have a material discrepancy with respect to weight, the weight of the package is not recorded.  *Id.* ¶ 52.  The lot of food products is instead left on the shelf, and the second, statistical analysis, phase does not occur.  *Id.* ¶ 37.

During the statistical analysis phase, products that have been identified as having a material discrepancy with respect to weight are reweighed, using a computer-based application known as the "WinWam" program.  *Id.* ¶¶ 46–47.  The WinWam program can test only 12 packages at once.  *Id.* ¶ 51.  For lots with 12 or fewer packages, the entire lot is weighed; for lots

with more than 12 packages, the inspector weighs only 12. *Id.* ¶ 48. For WinWam testing to comply with NIST Handbook 133, the sample of 12 must be randomly selected. *Id.* ¶¶ 56–58. The WinWam testing program generates a document called the "Package Checking Detail." *Id.* ¶ 49. It lists the product's gross weight, tare, net weight, labeled weight, error, maximum allowable variance, cost error, and percentage error. *Id.* ¶ 50. "Tare" refers to "a deduction from the gross weight of a substance and its container made in allowance for the weight of the container." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/tare.

If the WinWam program report finds a material discrepancy with respect to the weight of the products tested, the store is furnished with a Notice of Hearing and a Package Control Inspection sheet. *Id.* ¶ 53. The protocol further requires that the inspector create a Certificate of Inspection ("COI") for every inspection. A COI sets out the total number of lots tested, approved, and condemned; the charges under the relevant code violation; and the total number of packages tested, approved, and condemned. *Id.* ¶¶ 68–69. Completed COIs include data as to how many lots of products passed the audit phase of the DCA inspection, although the COI does not identify the type of product that the successful (*i.e.*, properly weighted) lots contained. *Id.* ¶ 70.

During the DCA's 2014–2015 investigation of Whole Foods, COIs were prepared with respect to only five of the 13 inspections. *See* Sellinger Decl. Ex. 15.A at 74 (Chelsea store, June 16, 2014); *id.* Ex. 15.B at 35 (Union Square store, Feb. 17, 2015), 55 (Columbus Circle store, Feb. 20, 2015), 79 (Brooklyn store, Feb. 19, 2015), 85 (Tribeca store, Feb. 18, 2015). COIs were not prepared for either of the inspections of the Bowery store.

### 2.    Inspector Moriarty's 2014 Inspections

Between October and December 2014, Inspector Moriarty conducted eight inspections of Whole Foods stores, including one of the Chelsea store and one of the Bowery store.  JSF ¶ 71.[7] Her first inspection was of the Bowery store, on October 10, 2014, *see* Sellinger Decl. Ex. 15.A at 30–40; her inspection of the Chelsea store, on November 7, 2014, was her third, *id.* at 80–96. During her inspections, if an item, or package, failed the audit phase, Moriarty removed the entire lot of packages for statistical analysis testing.  If there were more than 12 packages in the lot, Moriarty took 12 of the removed packages to test in the WinWam program.  Sellinger Decl. Ex. 5 ("Moriarty Dep.") at 86–87, 99.  In choosing the 12 packages to subject to such testing, Moriarty did not use a number table or other randomizing methodology.  JSF ¶¶ 64–65.

Moriarty did not produce a COI for any of her inspections of Whole Foods stores.  *Id.* ¶ 71.  When deposed, she did not recall how many packages she inspected at the Whole Foods stores, *id.* ¶ 76, although, she testified, she would typically look at about 300 packages in an inspection, *id.* ¶ 77.  Moriarty also did not recall how many lots she inspected at the Whole Foods stores, *id.* ¶ 78, although she estimated that she would typically look at about 25 to 30 lots per inspection, *id.* ¶ 79.  Moriarty testified that in each of her Whole Foods store inspections, some lots—she did not recall how many—passed the initial audit test phase.  *Id.* ¶¶ 78–80.

Although Moriarty did not record or recall the rate of successes and failures in her inspections, she "tended 'to make a habit of checking the lot [that previously failed] in the next location.'"  *Id.* ¶ 82 (quoting Moriarty Dep. at 146–47).

---

[7] Inspector Moriarty inspected the Bowery store on October 10, 2014, Sellinger Decl. Ex. 15.A at 30–40, the Midtown East store on October 22, 2014, *id.* at 54–66, the Chelsea store on November 7, 2014, *id.* at 80–96, the Union Square store on November 10, 2014, *id.* at 2–12, the Tribeca store on November 25, 2014, *id.* Ex. 15.B at 2–13, the Upper West Side store on December 1, 2014, *id.* at 13–31, the Columbus Circle store on December 2, 2014, *id.* Ex. 15.A at 13–29, and the Brooklyn store on December 3, 2014, *id.* at 41–53.

### 3.   Inspector Gershkovich's 2015 Inspections

Inspector Gershkovich conducted four investigations of Whole Foods stores, all between February 17 and 20, 2015.[8]  *See id.* ¶¶ 72–73.  He did not inspect either the Bowery store or the Chelsea store.  If a lot failed during the audit test phase, to choose 12 packages from the lot to be tested in the WinWam program as part of the statistical analysis phase, Gershkovich selected the 12 closest products.  *Id.* ¶ 63.  Gershkovich also did not use a random number table or generator in making this selection.  *Id.* ¶ 62.

Gershkovich created a COI for each of his four inspections.  *Id.* ¶ 72.  The COIs reflect that at Gershkovich's first inspection, 25 lots passed inspection and 10 lots failed; at his second inspection, 19 lots passed and 8 lots failed; at his third inspection, 18 lots passed and 8 lots failed; and at his final inspection, 23 lots passed and 1 lot failed.  *Id.* ¶ 73.

### 4.   Findings of the DCA Investigation

The DCA investigation of Whole Foods stores in New York City found, across 13 inspections of eight stores, 80 lots of products that were short of their reported weight.  *Id.* ¶ 101.

Relevant to the types of products for which John shopped, a "Chocolate Cupcake 6 pack" was found to be short weight both on December 2, 2014 at the Columbus Circle store and on December 3, 2014 at the Brooklyn store.  *Id.* ¶ 103; Sellinger Decl. Ex. 15.A at 25, 50.  Moriarty, who led these two inspections, testified that she did not recall whether the chocolate cupcake 6-pack products found short weight were the same or a different item.  JSF ¶ 104.  The DCA did not make any finding of short-weighted chocolate cupcakes at either the Bowery or Chelsea stores, where John shopped.  *Id.* ¶ 109.

---

[8] Inspector Gershkovich inspected the Union Square store on February 17, 2015, Sellinger Decl. Ex. 15.B at 32–48, the Tribeca store on February 18, 2015, *id.* at 80–96, the Brooklyn store on February 19, 2015, *id.* at 56–79, and the Columbus Circle store on February 20, 2015, *id.* at 49–55.

As to cheese products, during three of Moriarty's inspections, one lot of a cheese product was found to be short-weight, Pl. 56.1 Counter ¶ 22: "Red Leicester" cheese at the Union Square store on November 10, 2014, Sellinger Decl. Ex. 15.A at 8; "Fresh Farmers Cheese" at the Upper West Side store on December 1, 2014, *id.* Ex. 15.B at 27; and a "Cheese Plate in the Park" at the Columbus Circle store on December 2, 2014, *id.* Ex. 15.A at 27.  And, during two of Gershkovich's inspections, a total of four lots of cheese product were found to be short-weight, Pl. 56.1 Counter ¶ 22: "Swiss Raclette Emmi Roth," "Snofrisk Semi-Hard," and "Shredde[d] Mozzarella Cheese" at the Union Square store on February 17, 2015, Sellinger Decl. Ex. 15.B at 36; and "Gouda Parrano" at the Tribeca store on February 18, 2015, *id.* at 93.  The DCA did not make any finding of short-weighted cheese at either the Bowery or Chelsea stores.  JSF ¶ 110.

Plaintiff's expert witness Marianne Delperdang, who addressed the NIST standards as applied to the DCA investigation and to Whole Foods practices, testified that the data yielded by the DCA investigation does not permit one to extrapolate from an item tested and found short-weight to items not tested or reveal the probability that a pre-packaged item sold at Whole Foods was short-weight.  *Id.* ¶¶ 94, 96.  That is because, she testified, the identified data reports only the weight shortages that were found, not the probability that other items might also be found short-weight.  *Id.* ¶¶ 95, 99.

### 5.       The Settlement Agreement Between the DCA and Whole Foods

On December 23, 2015, after the CAC was filed, Whole Foods and the DCA entered into a settlement agreement.  *See id.* ¶ 132.  It terminated the DCA investigation against Whole Foods in exchange for Whole Foods' (1) payment of $500,000, and (2) implementation of policies and procedures governing the accuracy of prices and labels.  *See* Sellinger Decl. Ex. 21 ("Consent Order") ¶¶ 12, 20–34.

The Consent Order represents that Whole Foods "denies all of [the DCA's] allegations," and that "its agreements and payments pursuant to [the Consent Order] do not constitute an admission or finding of wrongdoing." *Id.* ¶ 14. It further states that Whole Foods "asserts that any items that were mistakenly labeled were incidents of simple human error, and not as a result of intentional misconduct." *Id.* ¶ 15. Finally, the Consent Order provides that Whole Foods and the DCA agree that: (1) the violations alleged by the DCA are limited to New York City; (2) the DCA did not make any findings as to fraud with respect to New York City stores; and (3) the DCA did not find any evidence of systematic or intentional misconduct by any individual across the Northeast region or the company. *Id.* ¶ 27.

### C.      Whole Foods' Cupcake and Cheese Preparation and Weighting Practices

Whole Foods' procedures for the preparation of pre-packaged cupcakes and cheeses—the foods purchased by John—are as follows.

### 1.      Whole Foods' Procedures for Cupcakes

Whole Foods makes pre-packaged baked goods, including cupcakes, "in-house" in its New York City stores. *See* Def. Counter 56.1 ¶ 101. All Whole Foods pre-packaged cupcakes made in store and sold in New York City are made from recipes on Whole Foods' computer system. *Id.* All Whole Foods stores in the Northeast Region use uniform recipes and procedures for baking and producing such cupcakes. *Id.* ¶ 100. Whole Foods also maintains uniform procedures for weights and measures at all of its stores throughout the Northeast region, which are implemented by individual store leadership. *See id.* ¶ 116.

Pre-packaged food products are priced according to their weights. JSF ¶ 4. Pre-packaged cupcakes are labeled with the declared minimum weight associated with their recipe. Def. Counter 56.1 ¶ 102. The declared minimum weight is determined during the "product development process" by weighing several batches of cupcakes to determine the declared

minimum weight of a single product, which is then used to calculate the net weight of the item for sale. *Id.*

### 2.      Whole Foods' Procedures for Cheese

Whole Foods also sells pre-packaged cheese products, also priced by weight. JSF ¶¶ 3–4. Whole Foods' cheese preparation includes wrapping the cheese or placing it in a plastic container, taking its "tare weight," and labeling the cheese. *See* Def. Counter 56.1 ¶ 124. A "tare weight" is the gross weight of cheese product and wrapper, minus the tare. At all relevant times, in determining the observed (*i.e.*, net) weight of cheese and therefore the corresponding price, Whole Foods calculated a "miscellaneous tare." Def. Counter 56.1 ¶ 108. The parties dispute whether the miscellaneous tare was sufficient to account for moisture loss. *Id.* ¶¶ 108–09. Moisture loss occurs over a period of time and is affected by the conditions of the store. JSF ¶¶ 123–24.

Whole Foods cuts its cheeses to satisfy customer demand for a specific time period. The parties dispute whether that time period is typically a couple days or around five days. Pl. Counter 56.1 ¶ 68. Whole Foods claims that the shelf life of cheese, four weeks, is longer than the period of time in which it offers cheese for sale at a store. Def. Counter 56.1 ¶ 105. Whole Foods' Global Executive Coordinator of specialty products, Cathy Strange, testified that Whole Foods has the shortest shelf life of any retailer in the United States. JSF ¶ 121.

After the DCA investigation, in March 2015, Whole Foods conducted its own informal investigation into moisture loss in cheese. Def. Counter 56.1 ¶¶ 106, 109. This testing took place at the Port Chester, New York store, which was not inspected by the DCA. *See id.* ¶ 109. The informal testing was done to determine if cheeses lose weight over the entire duration of their shelf life, *id.* ¶ 106, not the two- to five-day period during which cheese is in fact on the

shelf in Whole Foods stores, *see id.*  The study revealed varying rates of moisture loss between hard and semi-soft cheeses. *Id.* ¶¶ 106, 110.

In July 2015, Whole Foods updated its methodology for calculating its tare for cheeses. *Id.* ¶ 108.

### III.   Discussion

With discovery complete, Whole Foods argues that the evidence developed, read in the light most favorable to John, would not permit a jury to find that Whole Foods ever overcharged John personally.  It thus argues that John is unable to establish two elements essential to each of his causes of action: *injury* (that John paid a higher price than justified by the actual weight of a cheese or cupcake product he bought); and *causation* (that this injury was caused by an unlawful practice, to wit, applying an exaggerated weight to food priced by weight).

And, for the same reasons, Whole Foods argues, John can no longer establish Article III standing:  Although John's complaint once pled facts sufficient to allege an injury-in-fact, John's inability on the now-closed record to establish injury to himself means he cannot meet the heightened standard applicable post-discovery to establish such standing.  Def. Mem. at 23–25. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding "irreducible" elements of Article III standing are injury-in-fact, in the form of "actual or imminent" and "concrete and particularized" harm to a "legally protected interest"; causation of the asserted injury by defendants' actions; and redressability of injury); *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 412 (2013) (noting at summary judgment stage, party invoking federal jurisdiction "'can no longer rest on . . . "mere allegations," but must "set forth" by affidavit or other evidence "specific facts."'" (quoting *Lujan*, 504 U.S. at 561)).

Whole Foods' summary judgment motion on these grounds arises in an unusual context. In the ordinary case brought by a consumer alleging fraud or similar misconduct, the issue on a

defendant's motion for summary judgment is whether the evidence particular to the plaintiff's experience could establish liability. In contrast, here, John has adduced literally no evidence as to his own purchases that could substantiate a claim against Whole Foods.

The evidence relating to John's purchases instead is limited to (1) his testimony that, during 2014 and 2015, he purchased cupcakes and cheese products from time to time at Whole Foods' Bowery or Chelsea stores, *see* JSF ¶ 11; Def. Counter 56.1 ¶ 97; and (2) his bank statements, which reflect, generally, the fact of 22 occasions when he made purchases from one of those two stores, JSF ¶¶ 14–15, although these do not identify the product that was purchased, let alone its labeled weight, actual weight, or price. John does not claim ever to have weighed any food he purchased at Whole Foods. Sellinger Decl. Ex. 2 ("John Dep.") at 49–50. Nor does he claim ever to have perceived in real time, while in possession of such food, that it weighed less than labeled, beyond noting that Whole Foods products generally seem "kind of pricey." *See id.* at 50–51. Nor, needless to say, has John preserved such bygone comestibles so as, theoretically, to enable their weighing today. *See* JSF ¶¶ 17–19.

John instead bases his claim of injury on two other categories of evidence. The first is the evidence adduced in the DCA investigation. At the time of the CAC, John alleged that the DCA's results supported the inference that 89% of Whole Foods' pre-packaged items bore inflated weights. *See* CAC ¶¶ 19–20. This claim was centrally responsible for John's pleading of an injury to himself being held plausible by the Second Circuit. *See Whole Foods II*, 858 F.3d at 737. Although John appears to have retreated from that precise contention, his claims continue to rely heavily on the DCA investigation. *See* SAC ¶¶ 17–24. The second category of evidence relates to Whole Foods' general practices, as to the preparation and weighing of cupcakes and cheese. This evidence, John contends, would permit a finder of fact, through

extrapolation, to infer that John was overcharged for pre-packaged cheese and cupcake products during 2014 and 2015.

### A.   Applicable Legal Standards

#### 1.   As to Summary Judgment

Notwithstanding the unusual nature of the evidence on which John relies, familiar standards govern Whole Foods' motion for summary judgment.

As movant, Whole Foods must show, on one or more required elements of the plaintiff's claims, "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the plaintiff, as the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial. A plaintiff must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Where a plaintiff cannot adduce proof sufficient to establish an essential element of her claim, there can be no genuine issue of material fact, because a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *see also Silver v. City of New York*, 947 F.2d 1021, 1022 (2d Cir. 1991).

A plaintiff "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might

affect the outcome of the suit under the governing law will preclude a grant of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

> ### 2.   As to the Elements of John's Claims

John's claims arise under New York law.

Both GBL § 349 and § 350 require that the plaintiff suffer an injury as a result of the deceptive practice.  Section 349 prohibits deceptive acts and business practices.  *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ("[U]nder § 349, a plaintiff must allege: (1) the act or practice was consumer oriented; (2) the act or practice was misleading in a material respect; and (3) *the plaintiff was injured as a result*." (emphasis added)).  Section 350 prohibits false advertising.  *See Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 607 (S.D.N.Y. 2012) (claim for false advertising under § 350 requires showing, *inter alia*, "that the plaintiff was injured as a result of the deceptive practice, act or advertisement" (citation and internal quotation marks omitted)).

Similarly, to establish unjust enrichment, the plaintiff must establish that a benefit has been unfairly conferred on a defendant *to the detriment of the plaintiff.  See Leibowitz v. Cornell Univ.*, 584 F.3d 420, 435 (2d Cir. 2009) (claim for unjust enrichment cannot stand where plaintiff did not receive less than that to which he was entitled); *In re Canon Cameras*, 237 F.R.D. 357, 359–60 (S.D.N.Y. 2006) (plaintiff can bring claim for unjust enrichment only where he received "less than what he bargained for").

Thus, on all claims, if John "fail[s] to identify sufficient evidence to permit a jury to find that [he] suffered any injury from the alleged violation," Whole Foods "is entitled to summary judgment." *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2011 WL 196930, at *5 (S.D.N.Y. Jan. 21, 2011).

**B.      Analysis**

As the Second Circuit's decision reviving John's complaint shows, a consumer plaintiff may sometimes, at the pleading stage, state a plausible claim of injury to himself solely by alleging that the defendant subjected a high percentage of similarly situated consumers to an unlawful practice.  However, as the assembled case law reflects, a plaintiff who has been unable to adduce in discovery evidence of injury specific to himself and who seeks to survive at summary judgment exclusively by extrapolating from general statistical patterns faces a more challenging task.  *See Whole Foods II*, 858 F.3d at 737–38 (although allegations based on the DCA investigation made it "*plausible* that John overpaid for at least one product," these may not suffice "under the more demanding standards applicable at summary judgment" (emphasis added)); *see also Baker v. Bridgestone/Firestone Co.*, 966 F. Supp. 874, 876 (W.D. Mo. 1996) ("As a general rule, statistical evidence alone is insufficient to avoid a motion for directed verdict and necessarily a motion for summary judgment.").  Of course, at some level, all evidence is inherently probabilistic.  *See, e.g.*, *Victor v. Nebraska*, 511 U.S. 1, 15 (1994) ("The beyond a reasonable doubt standard is itself probabilistic."); *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir. 1987) (Posner, J.) ("All evidence is probabilistic—statistical evidence merely explicitly so.").  The problem comes when a plaintiff, lacking any personalized evidence, proposes to use the statistical incidence of unlawful behavior on the part of a defendant as the sole basis on which to establish—and to seek to recovery for—an injury to himself.

At the time of the Second Circuit's decision, this appeared to be precisely the question that John's case would present on summary judgment, insofar as John relied on the allegation that the DCA investigation established an 89% likelihood that a pre-packaged food product sold by Whole Foods bore an inflated weight. Cases arising in a variety of contexts have considered when proof of this nature is sufficient to support a plaintiff's verdict, with some analyzing the injury issue as bearing on the plaintiff's ability to prove his claim on the merits and others analyzing it as bearing on the plaintiff's ability to establish standing. A brief review of two particularly instructive cases is useful here.

In *Krim v. pcOrder.com, Inc.*, 402 F.3d 489 (5th Cir. 2005), the Fifth Circuit considered this question in a case involving a nearly identical injury percentage to the 89% originally alleged by John here. The plaintiffs in *Krim* brought claims against pcOrder.com under Section 11 of the Securities Act of 1933, which provides a right of action to "any person acquiring" shares issued pursuant to an untrue registration statement. *Id.* at 491–92. The Fifth Circuit accepted that, statistically, there was a 90% chance that any pcOrder.com shareholder held at least one share of stock that was traceable to the defective registration statement. *Id.* at 496, 501. But such a statistical likelihood, the Fifth Circuit ruled, did not absolve the individual plaintiff of the duty to show that his or her shares were in fact so traceable. *Id.* It therefore held that plaintiffs who had not come forward with proof as to the traceability of their own shares lacked standing. *Id.* at 502. Such statistical evidence, the Fifth Circuit noted, "merely demonstrates the probability that *anyone* with *x* number of shares will possess some tainted shares. It says nothing about the shares that one particular individual actually owns." *Id.* at 501. The court offered an analogy:

> Taking a United States resident at random, there is a 99.83% chance that she will be from somewhere other than Wyoming. Does this high statistical likelihood

alone, assuming for whatever reasons there is no other information available, mean that she can avail herself of diversity jurisdiction in a suit against a Wyoming resident? Surely not.

*Id.* at 497 (footnotes omitted).[9]

In *Coffelt v. Kroger Co.*, No. EDCW 16-1471 JGB (KKx), 2018 WL 6004543 (C.D. Cal. Aug. 17, 2018), a district court dismissed, at the summary judgment stage, a claim for lack of Article III standing based on the plaintiff's failure to adduce evidence that the actual product he

---

[9] To the same end, the Fifth Circuit drew upon Professor Charles Nesson's famous "blue bus" hypothetical, which is as follows:

> While driving late at night on a dark, two-lane road, a person confronts an oncoming bus speeding down the center line of the road in the opposite direction. In the glare of the headlights, the person sees that the vehicle is a bus, but he cannot otherwise identify it. He swerves to avoid a collision, and his car hits a tree. The bus speeds past without stopping. The injured person later sues the Blue Bus Company. He proves, in addition to the facts stated above, that the Blue Bus Company owns and operates 80% of the buses that run on the road where the accident occurred. Can he win?

> In this case and others like it, the plaintiff will lose; in fact, the case is unlikely even to reach the jury. Although the defendant probably caused the plaintiff's injury . . . [t]he factfinder can only conclude from the plaintiff's evidence that there was an 80% chance that he was injured by the Blue Bus Company and a 20% chance that he was not. . . . [T]he factfinder cannot, and the public knows it cannot, make anything other than a bet on the evidence. Because the judicial system strives to project an acceptable account about what happened, then, the plaintiff's evidence is insufficient, notwithstanding the high probability of its accuracy.

Charles Nesson, *The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts*, 98 Harv. L. Rev. 1357, 1378–79 (1985) (footnotes omitted); *see also* Laurence H. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv. L. Rev. 1329, 1349 (1971) ("[E]ven assuming a [preponderance of the evidence] standard of proof . . . , the plaintiff does not discharge that burden by showing simply that four-fifths, or indeed ninety-percent, of all blue buses belong to the defendant."); *cf. Smith v. Rapid Transit, Inc.*, 58 N.E.2d 754, 755 (Mass. 1945) (affirming, in the case on which the "blue bus" hypothetical was based, a directed verdict for defendant bus company; court notes that "the fact that colored automobiles made in the current year outnumber black ones would not warrant a finding that an undescribed automobile of the current year is colored and not black, nor would the fact that only a minority of men die of cancer warrant a finding that a particular man did not die of cancer." (internal quotation marks and citations omitted)); *see also Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 360 (7th Cir. 1998) (Posner, J.) (discussing probabilistic evidence and blue bus hypothetical).

bought was deficient.  Like this case, *Coffelt* involved a consumer plaintiff.  As relevant here, he

claimed injury from having purchased, on October 17, 2014, a bag of Kroger Peas & Carrots

during a period when certain peas remained subject to a bacteria-contamination recall.  *Id.* at *9–

11.  The recall was of peas packed by CRF Frozen Foods ("CRF"), which had supplied Kroger

with frozen peas.  *Id.* at *6.  Without more, however, the district court held, that recall did not

establish an injury-in-fact.  The court explained that "[t]here is no evidence before the Court that

the *specific package* Plaintiff purchased had in fact been adulterated or contaminated," that not

all Kroger Peas & Carrots packed between the recall dates had contained CRF peas, and that the

plaintiff had neither become sick nor complained at the time.  *Id.* at *11.  The court therefore

held that "[p]laintiff has not presented sufficient evidence that a reasonable juror could conclude

he was exposed to a dangerous substance (*i.e.*, that the product he bought was contaminated)."

*Id.*

Measuring John's claims against these precedents, the Court has substantial doubt

whether, as a matter of law, John's claims could prevail even if the evidence adduced in

discovery had shown—as John's complaint anticipated—that the DCA investigation had reliably

determined that 89% of all pre-packaged goods sold by Whole Foods in the relevant time period

had been short-weight.  Rather, as *Krim* and *Coffelt* suggest, some particularized proof is

necessary.  It is not enough merely to situate the product purchased by a plaintiff within a

universe of products most, but not all, of which were sold illegally.

The same principle follows from *Amidax Trading Group v. S.W.I.F.T. SCRL,* 671 F.3d

140 (2d Cir. 2011), and *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014).  In its

earlier decision dismissing John's claims on this ground, this Court relied on these two decisions,

which each dismissed claims for lack of standing.  *See Whole Foods I*, 167 F. Supp. 3d at 535–

37.  To be sure, in reversing, the Second Circuit held that *Amidax* was factually distinguishable and that John's injury claim, as pled, was plausible.  *See Whole Foods II*, 858 F.3d at 738.  But, with this case now at summary judgment, the analysis and holdings in *Amidax* and *Wallace* reinforce that a claim like John's cannot prevail at trial—and thus cannot survive summary judgment—based solely on statistical data indicating that consumers of a given product were statistically likely to have been injured.  *See Amidax*, 671 F.3d at 148–49 (upholding dismissal where plaintiff company failed to make particularized showing that its financial information was among data unlawfully used by defendant); *Wallace*, 747 F.3d at 1030–31 (upholding dismissal of claims of a defective product; requirement that an injury-in-fact be "particularized" means "it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, [a] plaintiff[] must allege that *their* product *actually exhibited* the alleged defect," and because plaintiffs did not articulate "any particularized reason to think [that their] own packages of Hebrew National beef actually exhibited the alleged non-kosher defect, . . . it remain[ed] entirely possible, maybe probable, that the packages of beef they personally purchased . . . . [were] *exactly what was promised*." (quotation marks and citations omitted)).

Therefore, even if discovery here had validated the allegation in John's complaint that the DCA had demonstrated an 89% likelihood that any pre-packaged food product sold by Whole Foods during 2014 and 2015 was priced at an inflated weight, this statistical finding, alone, could not have carried John's claims across the goal line.

### 1.     Individual Findings of Short-Weighted Products

In fact, however, discovery as to the DCA investigation, reviewed above, did not validate that allegation.  It did not come close.  And John himself, tellingly, no longer argues that the

results of the DCA investigations supports the claim that 89%—or any determinate share—of sales of pre-packaged food during 2014 and 2015 were overpriced.

Instead, as discovery showed, for the eight inspections that yielded the 89% statistic, the DCA inspector obtained data as to the incidence of short-weighted food only with respect to the subset of pre-packaged food products that reached the second phase of its inspection process— the statistical analysis test.  But the products that were subjected to that test were only those that had failed at the initial phase—the audit test.  During the audit test, the DCA inspector selected products from a lot and manually weighed them.  Only if the products tested in the audit phase were found to have a material discrepancy were they subjected to the second phase, consisting of statistical analysis testing.  If the products tested in the audit phase were not found to have a material weight discrepancy, they were returned to the shelf.  Their weights—and the number of fully compliant packages—went unrecorded.

Under these circumstances, whatever the wisdom of this methodology, the outcome of the second phase of the DCA investigation cannot be taken to reflect, at all, the incidence of short-weighted food products at Whole Foods.  That phase by definition cherrypicked only lots that had failed the initial phase and excluded those that had passed.  This methodology was by definition and design unrepresentative.

Given the DCA's methodology leading to the 89% statistic, with an untold number of compliant packages having gone unrecorded and with this number today being lost to history, no reliable estimate can be made of the incidence of noncompliance among the tested food products. Therefore, even if the second phase could be reliably said to have yielded an 89% fail rate, that phase—testing as it did only those lots that failed the first, audit test—cannot be treated as remotely representative.

Notably, personnel at the DCA itself identified this methodological shortcoming before the agency issued the press release that occasioned this lawsuit. Prior to its publication of the press release showcasing the 89% figure, DCA Director of Quality Assurance Brandon Freeman raised—unsuccessfully—a concern about including in the press release data derived only from products that reached the statistical analysis phase, *i.e.*, based only on tested lots that had failed the first phase. He wrote:

> Do we need data on the lot that failed only or on both lots? If we include data on both lots, we would need to account for the fact that the passed lot was tested based on the initial package audit, for which we don't have accurate totals. If we include data for the failed lots only, I'm not sure how meaningful this data really is, since we can only say that for lots that failed, x packages failed and not the entire universe of packages.

Sellinger Decl. Ex. 10 at 9.

The limited data amassed by the DCA as to the two stores at which John shopped and the products that he attests to having bought further undermines any claim that the DCA's results can establish an injury to John.

First, the Bowery and Chelsea stores at which John shopped were inspected only three times. Two of these inspections were conducted by Moriarty. As with the eight stores inspected leading to the 89% statistic, because Moriarty failed to complete COIs, there is no information as to the number of food products that passed the audit phase. However, even at the statistical analysis phase, the Whole Foods Report stated that the Bowery store "show[ed] the lowest percentage in Failure rate" among the eight stores inspected by Moriarty. Whole Foods Report at 5. The only inspection of the Bowery or Chelsea stores that resulted in a COI was in June 16, 2014. During that inspection, the COI reflects that inspectors weighed 220 packages of which 18

failed, an 8% failure rate at the audit phase.  This is a far cry from the 89% figure contained in the DCA's Whole Foods Report and touted in its Press Release.[10]  Sellinger Decl. Ex. 15.A at 74.

Second, the DCA did not record any finding that chocolate cupcakes or cheese products, the only two pre-packaged products that John claims to have bought, were short of their labeled weight at either the Bowery or Chelsea stores.  JSF ¶¶ 109–110.  Plaintiff's own expert witness, Marianne Delperdang, testified that the inspectors' findings as to violations elsewhere could not be extrapolated to other products or stores or even to the same product in the same store on a different date.  Id. ¶¶ 94, 96.  And the record leaves unclear whether the short-weighted cheese and cupcakes found at stores at which John did not shop are the same product as those he attests to having purchased.  Moriarty was uncertain whether the two sets of chocolate cupcakes six-pack her team weighed were even the same product.  Id. ¶ 104.  And six of the seven cheeses found to be short-weight at other stores—Red Leicester, Fresh Farmers Cheese, Gouda Parrano, Swiss Raclette, Snofrisk semi-hard, and a "Cheese Plate in the Park"—did not appear in John's list of regularly-purchased cheese.  As to the seventh, shredded mozzarella cheese, John attested to having bought "mozzarella cheese," but the record leaves opaque whether the cheese he bought was shredded or the same version of pre-packaged mozzarella cheese examined by the DCA.

The salient point is this:  The evidence from the DCA investigation falls far from supporting an inference that any of John's purchases were short-weight and overpriced.  Viewed in the light most favorable to John, the DCA results support only that some indeterminate portion

---

[10] Gershkovich, who did not inspect either the Bowery or Chelsea stores, did create COIs for his reinspections.  Across the four stores, 85 lots (75.9%) passed and 27 lots (24.1%) failed.  JSF ¶ 73.  These figures are inconsistent with an 89% error rate.  Had the findings from stores where COIs existed been taken into account, they stood to reduce, potentially markedly, the finding of 89% short-weighting yielded by Moriarty's work.

of pre-packaged goods at some Whole Foods stores, during the period of the DCA's review, were short-weight. Under the case law, given the absence of any evidence specific to John's purchases, that fact does not come close to giving rise to a material dispute of fact as to whether he was injured.[11]

### 2.      Unitary Practices

Presumably in light of these shortcomings, John, in opposing summary judgment, has shifted gear and adopted a new argument. He argues that the evidence would enable a jury to conclude that Whole Foods utilized food preparation and packaging practices that systematically assured that the products that he bought during 2014 and 2015—chocolate cupcakes and cheese products—were sold at inflated weights.

John is correct that, if the evidence enabled a jury reliably to find a unitary practice of falsely weighting these products at Whole Foods, this evidence would enable his claims of injury (and, necessarily, those of any other purchaser of such products) to reach a jury. However, the evidence he has adduced does not support that bold proposition as to either chocolate cupcakes or cheese products.

John's thesis is based on the testimony of Whole Foods' employees to the effect that Whole Foods utilizes uniform recipes and procedures for pre-packaged cupcakes and cheeses

---

[11] John relatedly argues that the sale of short-weighted cupcakes and cheese was so pervasive at Whole Foods that even if an occasional cupcake or cheese product was properly weighted, a jury could find that at least one such product that John bought during his 22 visits to Whole Foods in 2014 and 2015 must have been priced at an excessive weight. Pl. Mem. at 3–4. That argument fails for two independent reasons. First, as reviewed above, the DCA evidence—the only contemporaneous evidence of any sales of food at inflated weights—does not reliably establish that most, let alone nearly all, pre-packaged food products bore inflated weights. This is so whether pre-packaged food products are considered in general, or if the inquiry is focused on chocolate cupcakes and cheese in particular. Second, even if the DCA investigation had shown a statistically high incidence of inflated weighting of food, the precedents reviewed earlier (e.g., *Krim*, *Coffelt*, *Amidax*, and *Wallace*) do not permit a plaintiff to prevail based solely on statistical likelihood. Particularized evidence of injury would be needed.

across the company's New York area stores.  Pl. Mem. at 7–8.  On this premise, John reasons

that a single instance of a short-weight cupcake or cheese item could be found to dictate that all

food items of the same type, having been produced pursuant to the same specifications, must

have been identically short-weight.

John's theory that uniform recipes invariably lead to products of uniform weight is, of

course, in tension with lived kitchen experience.  Although it is undisputed that Whole Foods

uses uniform recipes and procedures for producing in-house pre-packaged cupcakes, it also

appears to be undisputed that those procedures are implemented by human beings, not robots.

As even the most punctilious baker will attest, some degree of deviation from a cookbook recipe

is inevitable.  The same recipe will not, time and again, produce confections that are identical

twins.

Decisive here, John's theory that the existence of a single short-weight Whole Foods

product means that all like products were equally short-weight is contradicted by the only record

evidence as to the weights, in fact, of Whole Foods pre-packaged goods during this period—the

results yielded by the DCA investigation.  As reviewed above, the DCA's spot-checks revealed a

mottled record.  Food items of the same type were sometimes found properly weighted (at either

the audit phase or the statistical analysis phase); sometimes they were found short-weight; and

some items found short-weight were found short-weight but to differing extents.[12]

John's premise of universality in product weight outcomes is thus defeated by the very

investigation that prompted him to bring this lawsuit.  Like the plaintiff in *Coffelt* who could not

---

[12] It is undisputed that "DCA inspectors look at the same or similar products in individual
inspections and follow-up inspections of the same or different stores within a supermarket
chain."  Pl. Counter 56.1 ¶ 49.  Where instances of short-weighting of a product were found at
one store but not reported short-weight at a later-inspected store, it is fair to infer that the audit
phase did not find weight deficiencies with that product.

prevail by merely assuming that all Kroger Peas packed between recall dates were contaminated because some were, and the plaintiff in *Wallace* who could not prevail by merely assuming that all Hebrew National hot dogs had a non-kosher defect because some did, John cannot simply assume that all chocolate cupcakes or cheese prepared pursuant to a common procedure proved, at the time of sale, commonly short-weight.

The evidence, in any event, as to both species of products—cupcakes and cheese—would not permit a jury to find, save by speculation, the uniform production of products that were short-weight at the moment of sale. The evidence instead supports the existence at Whole Foods of uniformly applicable procedures, but not of uniform results.

### a.   *Chocolate Cupcakes*

As to cupcakes, in preparing pre-packaged chocolate cupcakes in its New York City stores, Whole Foods employees are instructed to follow a "systematic" recipe stored on a computer program, "Chef Tech." Blankinship Decl. Ex. E ("Taylor Dep.") at 17. The program displays the "ingredients" and the "mixing and baking methodology" so that a "majority of folks who are trained as bakers can pick it up and be able to make it." *Id.* For cupcakes, there is a universal recipe with many "sub recipes," including for chocolate cake, kids' icing, cupcake frosting, and variations in cupcake-package sizes (*i.e.*, a single cupcake vs. a six-pack of cupcakes). *Id.* at 20–21. Recipe books in Whole Foods' bakery track those in Chef Tech. *Id.* at 18.

In-house pre-packaged cupcakes are labeled with the declared minimum weight associated with their recipe. Pl. Counter 56.1 ¶ 102. The declared minimum weight is determined during the product development process by weighing several batches of cupcakes to determine the declared minimum weight of a single product, which is then used to calculate the net weight of the item for sale. Def. Counter 56.1 ¶ 102.

Contrary to John's premise, however, Whole Foods' adoption of uniform procedures does not guard—or purport to guard—against human imperfection in the baking of chocolate cupcakes. The company's expectations as to the manner in which this product will be baked do not protect against subtle variations that may be caused by differences in chefs, batches, dates, venues, distractions, and other quotidian factors capable of skewing end-product weights. Critical here, the summary judgment record developed by John is devoid of any evidence that Whole Foods' cupcake-baking procedures ineluctably yielded identically-weighted cupcakes.

On the contrary, the consistent testimony of Whole Foods employees—corroborated by the varied results of the DCA investigation—is that they aspire to implement company recipes, not that deviation from such recipes is impossible. *See, e.g.*, Sellinger Reply Decl. Ex 24 ("Taylor Decl.") at 2 (explaining the deviation in weight for one of the chocolate cupcake six-packs cited in the DCA's Notice of Hearing as "consistent with individual error by a bakery team member at the store by either putting too little cake mix in the scoop or too little icing on the cupcake"); Consent Order ¶ 15 ("[A]ny items that were mistakenly labeled were incidents of simple human error, and not as a result of intentional misconduct."). This is corroborated by the DCA investigation. Among the pre-packaged chocolate cupcake six-packs that the DCA found short-weight at the statistical analysis stage—as to which it therefore logged records of product weights—on December 2, 2014 at the Columbus Circle store, the lot of chocolate cupcake six-packs tested was found short-weight by 25.2%. Sellinger Decl. Ex. 15.A at 18. The following day, December 3, 2014, at the Brooklyn store, the lot of chocolate cupcake six-packs tested was found to be short-weight by 31.0%. *Id.* at 46. John did not purchase pre-packaged chocolate cupcakes at either of those two stores. Chocolate cupcake six-packs, however, were not found to be short-weight at any other Whole Foods stores in New York City during the DCA's 2014 or

2015 inspections, despite the DCA's practice of checking similar products in other stores. *See*

Pl. Counter 56.1 ¶ 49.

        *b.*     *Cheese Products*

John's theory as to why Whole Foods' processes with respect to cheese yielded

uniformly short-weighted products is different. He contends that Whole Foods utilized in 2014

and early 2015 a "tare" calculation that failed to account for moisture loss over time. Such

moisture loss would tend to reduce the weight of a cheese product after the point at which it was

packaged and measured. Pl. Mem. at 23.

As reviewed above, in preparing cheese for sale, Whole Foods' procedure was to wrap or

place the cheese in packaging; weigh the cheese, adjusting for tare weight; and label the cheese,

with the price keyed to the weight as adjusted. Although the shelf life of cheese varies, Whole

Foods' employees typically cut cheese sufficient to satisfy customer demand for two to around

five days.

A number of variables may impact a cheese's rate of moisture loss. These include the

type of cheese (e.g., "hard" or "mature" cheese versus "fresh cheese") and the environment in

which the cheese is stored (e.g., whether there is sun exposure, what the storage temperature is,

and the circumstances in which the cheese is displayed). *See* Def. Counter 56.1 ¶¶ 106, 110.

In adjusting the weight to be affixed to a pre-packaged cheese item, Whole Foods, prior

to July 2015, included a "miscellaneous tare." The parties dispute whether, and to what extent,

the miscellaneous tare was sufficient to account for moisture loss. Def. Counter 56.1 ¶ 108.

John argues that the evidence would permit a jury to find that the weights assigned to the

cheese he purchased were necessarily too high, because Whole Foods systematically did not take

moisture loss into account. John's argument as to cheese is stronger than his argument as to

cupcakes, insofar as the evidence adduced coherently explains how a pre-packaged cheese item

could later, at the moment of sale, come to weigh less than as of the time of its labelling.  The longer, for example, that a particular piece of cheese sat on the shelf between its weighting and its purchase, the more likely that it would have experienced moisture loss, and the more likely that this moisture loss would have exceeded the adjustment reflected in Whole Foods' tare.

While ably explaining how a particular pre-packaged cheese item could come to bear a labelled weight exceeding its weight in fact, this evidence nonetheless falls well short of demonstrating a systematic, invariable short-weighting of cheese as a result of a failure to account adequately for moisture loss.  To choose an obvious example, where a customer purchased a cheese item immediately or soon after its weighing and labelling, there is no basis to infer post-weighting moisture loss at all, let alone sufficient post-weighting moisture loss to overcome Whole Foods' tare.  And the record is devoid of evidence whether the cheese items that John purchased were purchased soon after their weighting or sufficiently long thereafter for meaningful moisture loss to ensue.  The evidence therefore does not support a systematic practice of short-weighting cheese so as to permit John to establish injury to himself.

The other evidence on which John relies, while either indicative of or consistent with some short-weighting of cheese by Whole Foods, also falls short of demonstrating the categorical nature of this practice necessary for John to prevail given his lack of proof particular to his own purchases.  John notes, for example, an informal study by Whole Foods measuring moisture loss experienced by cheese over a four-week period.  Pl. Mem. at 22; *see also* Def. Counter 56.1 ¶ 106.  The study tested Parmigiano, Romano, Piave, Gruyere, 3-year Gouda, Reserve, Robusto, three species of Manchego, Campo, and Seaside.  Blankinship Decl. Ex. O at

1.[13]  It reported weight declines for all these categories of cheese during the four-week period, albeit at varying rates depending on the type of cheese.  Thus, while the record contains an inadequate explanation of the study's metrics, the chart reporting its outcome reflects a 0.4 figure for Parmigiano after week 1, a 0.39 figure after week 2, a 0.38 figure after week 3, and a 0.375 figure after week 4.  *Id.*[14]  The results for Seaside are 0.505 after week 1, the same 0.505 after week 2, then 0.48 after week 3, and then 0.47 after week 4.  This study, however, does not establish the systematic overweighting of cheese *as sold.*  As noted, the evidence is that Whole Foods typically cut cheese to satisfy customer demand over a much shorter (two- to five-day) period.  The study does not substantiate invariable moisture loss for cheeses sold shortly after weighting.

Finally, John notes that during the DCA investigation, pre-packaged cheese products were widely found to be short-weight, during the second, statistical analysis phase of the DCA's review.  Each of the 55 individual packages in seven lots of different cheese products tested at that stage failed.  Def. Counter 56.1 ¶ 22.  As explained, however, that phase tested only lots that had been determined at the initial, audit phase to have contained short-weight cheese.  These results fall short, therefore, of establishing systematic overweighting.

In sum, the Court holds that, on John's claims, there is no genuine dispute as to any material fact.  While John has adduced evidence that Whole Foods priced some pre-packaged food items based on inflated weights priced during 2014 and 2015, John has not come forward with non-speculative evidence on which a jury could reliably find that any of the items that he

---

[13] Of the cheeses tested, John has testified to purchasing only Parmigiano.  *See* Pl. Counter 56.1 ¶ 4.

[14] It is unclear to the Court whether these figures reflect the absolute weight of a tested piece of cheese at the end of each weight, or the percentage reduction in weight after each week.

bought were short-weight and therefore overpriced. John's claims therefore all fail as a matter of law.[15]

## C.   Standing Versus Merits

As noted, Whole Foods seeks both summary judgment on the merits and dismissal on the ground that John has failed to establish Article III standing. In the Court's assessment, whether John can establish injury-in-fact is an issue as to which the merits and the existence of Article III standing collapse. John's inability to so establish means that Whole Foods would be entitled to prevail on either ground.

Because standing is a jurisdictional issue, the case law directs in such circumstances that a court dismiss the case for lack of Article III standing rather than entering summary judgment for the defendant on the merits. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54–55 (2d Cir. 2016) (noting that dismissal for lack of Article III standing "is one for lack of subject matter jurisdiction; and, without jurisdiction, the district court lacks the power to adjudicate the merits of the case" (citations omitted)). And, because the Court's ruling is jurisdictional, the dismissal is, necessarily, without prejudice. *See Carter*, 822 F.3d ("[W]here there is a lack of Article III standing, 'Article III deprives federal courts of the power to dismiss a case with prejudice.'" (quoting *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999))).

---

[15] In light of this ruling, the Court denies as moot Whole Foods' argument that an adverse evidentiary inference against John would be warranted, based on John's having disposed of receipts from his purchases at Whole Foods after commencing this litigation. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107–110 (2d Cir. 2002) (standards for adverse inference). In any event, Whole Foods conceded, at argument, that an adverse inference would not be germane to the issues litigated at summary judgment, because Whole Foods does not dispute that John purchased cupcakes and cheese on or about the dates on which his debit card records reflect purchases at Whole Foods. *See* Dkt. 120 (transcript of argument) at 10–12.

For avoidance of doubt, however, were the standing and merits issues viewed as distinct and were standing held established, the Court would have entered summary judgment for Whole Foods based on John's failure, as developed above, to establish the merits elements of injury and causation.  The Court records this insofar as such may be of assistance to the parties, and to the Second Circuit, in the event of an appeal.

## CONCLUSION

For the reasons above, the Court accordingly dismisses John's lawsuit for lack of standing.

The Clerk of the Court is respectfully directed to terminate the motion pending at Dkt. 87 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 17, 2019
      New York, New York